**In re PANEL TOWN OF DAYTON, INC., Debtor.**

**Panel Town of Dayton, Inc., Plaintiff,**

**v.**

**Edward Corrigan, et al., Defendants.**

**Bankruptcy No. 04–36359.**
**Adversary No. 04–3311.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Feb. 10, 2006.

Alfred Wm. Schneble, III, Schneble, Cass & Assoc. Co. L.P.A., Dayton, OH, J. Joseph Walsh, Dayton, OH, for Debtor.

Donald F. Harker, Dayton, OH, trustee.

Douglas N. Hawkins, Cincinnati, OH, Mary Anne Wilsbacher, U.S. Trustee's Office, Columbus, OH, for U.S. Trustee.

## MEMORANDUM DECISION AND ORDER GRANTING JUDGMENT TO THE PLAINTIFF, PANEL TOWN OF DAYTON, INC., AND CROSS–CLAIMANT, DEL NORTE REFINANCE, LLC AND NOTICE OF TELEPHONE CONFERENCE

WILLIAM A. CLARK, Bankruptcy Judge.

This matter is before the court on Plaintiff and Debtor Panel Town of Dayton, Inc.'s ("Debtor" or "Panel Town") Complaint filed against the Defendants Edward M. Corrigan ("Corrigan") and Del Norte Refinance, LLC ("Del Norte"). In the Complaint, the Debtor alleges that Corrigan is in possession of property of the bankruptcy estate consisting of inventory and personal property valued at over $100,000.00 (the "Panel Town Property"). The Debtor also alleges that Corrigan wrongfully converted the Panel Town Property and requested an additional amount of damages in the amount of $100,000.00 for wrongful conversion and lost profits. The Debtor included Del Norte in the Complaint because Del Norte allegedly holds a first priority lien on the Panel Town Property.

Defendant Corrigan filed an Answer to the Complaint denying all of the allegations. Del Norte filed an Answer and Cross-claim confirming its alleged status as a perfected lien holder in the Panel Town Property and joining Panel Town in its allegations against Corrigan.

After the parties conducted extensive discovery, amended their pleadings to clarify the issues, and the court ruled on a summary judgment motion, [Adv. Doc. 80], the court heard this matter at trial on December 5, 2005. At the close of the trial, the parties requested and the court agreed to a post-trial briefing schedule. The parties filed simultaneous post-trial briefs on December 9, 2005, [Adv. Doc. 96–98], and Del Norte filed a reply brief on December 22, 2005. [Adv. Doc. 99.]

On January 3, 2006, the court entered an agreed order converting the Debtor's bankruptcy from a Chapter 11 proceeding to a Chapter 7 proceeding. At the trial on December 5, 2005, representatives for the Debtor, Corrigan, and Del Norte all agreed and stipulated to allow the court to go forward with this decision despite the pending conversion of the bankruptcy to Chapter 7. Although the outcome of this decision may have an effect on the Chapter 7 proceedings, delaying the trial and decision in this Adversary Proceeding would have served no useful purpose.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2).

## I. Findings of Fact

Douglas Dillin ("Dillin") is the owner, sole shareholder, and president of the Debtor, Panel Town. Between October 2000 and May 2003, Dillin operated Panel Town as a retail sales outlet for flooring and other related goods. [*See* Jt. Ex. 9.] This court ruled in September 2005 that Dillin was Panel Town's legal "alter ego" under Ohio state law. [*See* Adv. Doc. 80.]

The court does not have a complete picture of Dillin's business ventures, but the facts available indicate that Dillin's business history is complex. Although not directly related to this matter, Dillin also owned and operated at least one other Ohio corporation, Ultimate Flooring Co., which was incorporated in 1997. [*See* Jt. Ex. 10.]

As to Panel Town, Dillin's father obtained financing through Society National Bank for a corporation named Panel Town, Inc. as early as 1994. [Jt. Ex. 5.] Then in October 2000, all of Panel Town, Inc.'s assets and liabilities were assigned to Panel Town of Dayton, Inc., the current Debtor. [Jt. Ex. 6.]

In addition to obtaining financing through Society National Bank, Dillin also borrowed money from Society Bank's successor by merger, KeyBank National Association ("KeyBank"), as well as CDC Appliances, dba Ohio Valley Flooring ("CDC") between October 2000 and 2003. [Jt. Ex. 4, 8.] On February 6, 2003, Dillin executed a security agreement with CDC granting CDC a security interest in all of Panel Town's inventory and various other property. [Jt. Ex. 4.] On March 14, 2003, CDC perfected its security interest in the collateral. [Jt. Ex. 3.]

As successor in interest to KeyBank, Del Norte Refinance, LLC ("Del Norte") entered into a security agreement with Panel Town on March 26, 2004 and perfected that interest by filing a financing statement with the Ohio Secretary of State the same day. [Jt. Ex. 1, 2.] The financing statement covered all of Panel Town's personal property including inventory.

On April 24, 2004, CDC assigned all of its rights in the February 6, 2003 security agreement to Hamdi Soliman, Dillin's brother-in-law. On May 7, 2004 Soliman executed a subordination agreement with Del Norte subordinating his interest in Panel Town's property to that of Del Norte. [Jt. Ex. 1, 4.] Among the applicable provisions in the May 7, 2004 subordination agreement is a complete assignment of Soliman's security interests in Panel Town's personal property and inventory to Del Norte. [Jt. Ex. 4.]

In order to do business as Panel Town of Dayton, Inc. in Troy, Ohio, Dillin entered into two land contracts with the Defendant in this case, Edward M. Corrigan, on October 4, 2001. The contracts covered two pieces of real property located at 22 and 28 Weston Drive in Troy, Miami County, Ohio. The principal amount of the first land contract was $250,000.00. In accordance with the contract, Dillin paid $50,000.00 at closing with the remaining $200,000.00 to be paid at a rate of 7% interest in semi-annual installments of $14,072.22 each. [*See* Pl's Ex. 2.] The principal amount of the second land contract was $210,000.00. In accordance with that contract, Dillin paid a $35,000.00 deposit and was to pay the remaining $175,000.00 at a rate of 7% interest in semi-annual installments of $12,175.15 each.

By October 2002 and January 2003 respectively, Dillin had defaulted on both

land contracts by failing to make semi-annual payments when due. On February 20, 2003, Corrigan accelerated the debt owed under the contract in accordance with its terms and in May of that year Corrigan filed suit against Dillin seeking a foreclosure on the contracts.

The state court granted Corrigan a default judgment against Dillin on the foreclosure suit. In September 2003, a sheriff's sale occurred at which Corrigan purchased the property and Corrigan obtained a deficiency judgment against Dillin in an amount in excess of $200,000.00.

There are conflicting impressions regarding Dillin's business operations in the months prior to the sheriff's sale. Roger Beckstein, specifically, stated that he observed Panel Town in operation in November 2003, but later stated that it may have been sometime in the summer. There were also indications that Dillin had been locked out of the premises by the sheriff well before the sale in September. Whichever was actually the case, at the time of the sale, the business premises apparently contained a significant amount of inventory and personal property. Although the evidence is not clear as to when Dillin stopped operating his business in Troy, the fact is that some of Dillin's property was in the buildings until the week of November 24, 2003.

Two October 2003 letters from the Miami County Prosecuting Attorney to Scott Stout, the Staff Attorney at the Chapter 13 Trustee's Office, state, however, that although the deputy sheriff who conducted the sale knew immediately after the sale that Dillin had filed for bankruptcy, Dillin was still locked out of the building and refused entry until October 22, 2003. [Jt. Ex. 11, 12.] Thus, Dillin was definitely locked out of the premises from the date of the sheriff's sale on September 29, 2003 until he regained access on October 23, 2003.

In November 2003, the automatic stay was annulled as to Corrigan in Dillin's bankruptcy. At Dillin's creditor's meeting on November 19, 2003, Corrigan's agent attorney Ron Logan agreed that Dillin, who had had access to the buildings since October 23, 2003, could have until the end of November 2003 to remove the Panel Town Property from the premises owned by Corrigan.

The bulk of the testimony regarding Dillin's forced removal and lock out from the premises is based on events that took place the week of November 24, 2003. On Monday, November 24, 2003, Corrigan, through his agents, attorney Gerald Turner and son David Corrigan, changed the locks on the building. David Corrigan testified that he had done so at the request of Gerald Turner and Corrigan presented a receipt from the locksmith that verified the change. [*See* Def.'s Ex. A.]

On Wednesday, November 26, 2003, however, Dillin returned to the buildings. At this point the testimony diverges. Dillin testified that the buildings were unlocked and that he was preparing the inventory and other property for removal to another location. He also testified that he took little, if anything, from the buildings on that day.

David Corrigan, however, testified that Dillin broke in to the buildings and began removing the inventory. Both agree that upon discovering the break-in David Corrigan notified the police and a deputy sheriff arrived at the scene. Through discussions among the parties, it was agreed that Dillin could continue removing his items from the buildings for the remainder of that

day. The parties also agreed that Dillin could return on Friday, November 28, 2003, to remove the remainder of his inventory and goods.

When Dillin arrived on November 28, 2003, however, he was refused entry into the building by Corrigan's attorney, Gerald Turner. Despite their earlier agreement, Dillin was denied access to the buildings to remove his own inventory and goods. The decision to refuse access to Dillin on November 28, 2003 is memorialized in a letter from Gerald Turner to Dillin's bankruptcy attorney, David Fierst, dated December 11, 2003. In the letter, Turner stated that Dillin:

> ... had ample time to remove the property while they were in possession of the keys. Therefore, it is our position your client(s) have abandoned the property, and we are free to dispose of it in any manner we choose. To that end, we are contacting people who might be interested in the property. If your client(s) have any interest in purchasing the property, you should contact me for the arrangements.

[Jt. Ex. 13.] Between the date of that letter and April 2004, no formal action occurred regarding Dillin's inventory and personal property remaining in the two buildings.

The amount, nature, and value of the property in the buildings at the time Dillin was refused entry in November 2003 is a hotly contested fact in these proceedings. Dillin himself testified that the buildings were full of saleable material and valuable personal property. Dillin stated that he had access to the buildings prior to the week of November 24, 2003, but did not remove much material from them during that time. As noted, he also stated that he

removed nothing from the buildings on Wednesday, November 26, 2003.

In fact, Dillin stated with particularity that there was a significant amount of inventory in the buildings on November 28, 2003 when he was refused entry by Gerald Turner. He provided the court with an inventory of items in the buildings valued at $107,172.92. [Jt. Ex. 17.] Dillin stated that the inventory was created on November 18, 2003, although it was dated December 31, 2003, well after Dillin had been denied access to the buildings. In addition to Dillin's testimony, his expert, Roger Beckstein, testified that he had seen the bulk of the inventory on the premises when the store was operating sometime in 2003 and that the inventory was in good shape and saleable at the time he saw it. Beckstein was not certain if he was last there in July or November, 2003.

Edward Corrigan, however, testified that, while some inventory was clearly present, the buildings were "a mess" when he saw them sometime in November 2003. Kelly Corrigan also testified that he had seen the buildings in a shambles in December 2003. David Corrigan provided the most damaging testimony stating that Dillin had removed the bulk of his inventory and material prior to the week of November 24, 2003. He described that one whole showroom was empty and the contents had been moved prior to that Monday. He also testified that he had seen trucks and a light van removing material on Wednesday, November 26, 2003 and that a dumpster was present half filled with material that Dillin had been throwing away—all being a direct contradiction of Dillin's statement that nothing was removed on that day. Finally, David Corrigan testified that the buildings were in poor condition as of Friday, November 28,

2003, noting a water leak that several parties confirmed during the trial.

Frank Neil also testified that he had seen the stores in December 2003 and the inventory appeared to be in disarray, but present. None of the testimony before the court disputes that between December 2003 and April 2004, Corrigan did nothing to the buildings and expended no effort to maintain or care for the inventory and personal property there.

In April 2004, Dillin restarted negotiations with Corrigan to regain access to the buildings and to recover the goods that were in the buildings. These discussions are documented in a series of letters between Joseph W. Standicar, Dillin's attorney, and Gerald Turner. The first letter from Standicar, dated April 14, 2004, simply seeks access to the buildings so that Dillin can obtain possession of the inventory. [Jt. Ex. 14.] The second letter, dated April 22, 2004, indicates that Standicar and Turner had discussed the matter and that Turner had passed along Corrigan's intent to dispose of the property or sell the property in the buildings unless Dillin removed the property within the next 24 hours. The letter also indicates that Dillin was willing and able to remove the inventory in that time.

The third letter, also dated April 22, 2004, indicates that Corrigan requested $3,000.00 in payment for storage fees for the time between November 2003 and April 2004. In addition, the letter states that after Dillin was allowed to walk through the buildings that day, Dillin refused to pay the $3,000.00 for return of the property because he believed that "a considerable portion of the inventory that was left in the building has been removed in addition to a forklift and a pallet jack." [Jt. Ex. 16.]

On April 24, 2004, Kelly Corrigan put together a team of friends and began emptying the buildings. They threw away some material and cleaned up the buildings. Several witnesses testified as to the state of the contents of the buildings at that time saying that the contents were in deplorable condition and in disarray. None of these witnesses, however, had first hand knowledge of the status of the buildings in November 2003 when Dillin was locked out. All of the witnesses agreed, however, that much of Dillin's material was disposed of on April 24, 2004. Prior to that day, Corrigan also had sold some of the remaining inventory and a forklift to Frank Harlow for $5,000.00. Corrigan completed the sale of the buildings the next day to an unnamed third party for between $315,000.00 and $325,000.00.[1]

The Debtor filed bankruptcy on July 23, 2004 and this Adversary Proceeding was commenced on November 17, 2004. During the course of this litigation, each party retained an expert witness to view the remaining Panel Town Property in the possession of Frank Harlow in order to determine its value. The Panel Town Property can be broken down into two categories—equipment and inventory. Dillin claimed that the equipment included a desk, office equipment, a refrigerator, a telephone system, and numerous display

---

1. The court notes here that Corrigan himself was out of state at the time the buildings were sold. In actuality, he was rarely present for any of the dealings with the buildings and Dillin, but relied on his sons to do most of his business. While that reliance does not appear to have been damaging, he also relied heavily on his attorney, Gerald Turner. It was that reliance that became extremely harmful to Corrigan's case.

racks. On November 25, 2005, the experts inspected the items that Frank Harlow purchased from Corrigan. They did not find all of the equipment, but were able to value the forklift, the pallet jack, and the remaining inventory pictured in Defendant's Exhibit E.

Both experts observed some carpet remnants, cartons of congoleum forum plank, and many miscellaneous items. Corrigan's witness valued all of the remaining property and inventory at $8,500.00. [Def.'s Ex. F.] Dillin's witness valued the same inventory and property at $17,900.00. [Pl's Ex. 1.]

On February 8, 2005, Corrigan received $16,832.79 from the foreclosure sale of Dillin's personal residence based on a certificate of judgment filed in Greene County, Ohio. After applying that amount to the deficiency judgment against Dillin, Corrigan now alleges that he is owed $205,839.82 on the judgment against Dillin.

## II. Discussion

In this proceeding, the Debtor alleges that Corrigan refused to return the Panel Town Property located at the two buildings in Troy, Ohio and claims damages for that loss in the amount of $107,172.92 plus additional damages for loss of profits in the same amount. Del Norte was included in this Adversary Proceeding because it has a security interest in all of the Debtor's inventory and personal property.

Corrigan denies those allegations and claims that Dillin abandoned the Panel Town Property in November 2003. Corrigan also argues that Del Norte does not have a valid security interest in the property for various reasons.

The issues before the court can be identified as follows:

(1) Did the events that took place during the last week of November 2003 constitute conversion by Corrigan or abandonment by Dillin?

(2) If Corrigan did convert the Panel Town property in November 2003, what damages, if any, is Dillin owed for that conversion?

(3) Does Del Norte have a valid security interest in Dillin's Panel Town property?

■ Prior to addressing those legal issues, the court will reiterate that the witnesses in this matter have provided much conflicting testimony. As the trier of fact, the court "has the ability and responsibility to evaluate the credibility of the witnesses and the other evidence presented." *Thomasville Furniture Industries, Inc. v. Elder–Beerman Stores Corp.*, 250 B.R. 609, 631 (S.D.Ohio 1998). This is particularly true when the trial court must make findings as to the "design, motive and intent with which men act ...." *In re McConnehea*, 96 B.R. 121, 123 (S.D.Ohio 1988) (quoting *United States v. Yellow Cab Co.*, 338 U.S. 338, 341, 70 S.Ct. 177, 94 L.Ed. 150 (1949)); *see also Matter of Seeskin*, 91 B.R. 39, 40 (S.D.Ohio 1988); *In re Holcomb Health Care Services, LLC*, 329 B.R. 622, 656 (Bankr.M.D.Tenn.2004). Thus, the court has reviewed both the trial testimony and the other evidence presented and determined the outcome based on the most credible testimony and evidence available.

■ Also prior to addressing the dispositive legal issues, the court will address the objections and motion to strike set forth in Corrigan's closing argument. [Adv. Doc. 98.] In his closing argument, Corrigan notes and objects to the arguments presented by the Debtor and Del Norte in

their closing arguments regarding the issue of bailment. As Corrigan properly states, the cause of action of bailment was never pleaded in these proceedings prior to its mention in the written closing arguments. Corrigan is also correct that in order to raise the issue, the parties should properly have filed motions to amend the pleadings. Thus, the court has not considered the arguments regarding the legal issue of bailment in issuing this opinion.

In addition to the objection to the bailment arguments, Corrigan also moved to strike all of Del Norte's closing arguments regarding the previously ruled upon set off issue. As noted, this court issued an summary judgment decision in 2005 in which it ruled that Dillin was the *alter ego* of Panel Town of Dayton, Inc. and Corrigan would be allowed to set off his state court judgment against Dillin personally against any amount adjudged against him is this Adversary Proceeding. In closing, Del Norte argues that the court should revisit that decision at present because many new facts are available that may change the court's decision on the matter.

On Corrigan's motion to strike those arguments, the court agrees with Del Norte that many new facts are available that may have affected the court's decision on the summary judgment motion. Over Corrigan's objections, the court will address that determination in Section III of this decision. In doing so, however, the court will simply provide clarification as to the set off issue because each of the parties has now raised the issue in closing arguments. The court on its own (*sua sponte*) will not disturb the substantive ruling on the summary judgment motion.

### A. Panel Town's Conversion Claim

Panel Town claims that Corrigan converted the inventory and personal property that was located in the Panel Town store through his actions during the week of November 24, 2003. The facts regarding that week are set forth above, but a brief review is warranted.

On September 29, 2003, Corrigan purchased the buildings at a foreclosure sale brought about by the suit on land contract foreclosure under Ohio Revised Code Section 1313.07 filed against Dillin in state court. From the time of the forcible entry and detainer and foreclosure law suit until October 23, 2003, Dillin was forcibly locked out of the buildings. On or about October 23, 2003, based on discussions with the Chapter 13 trustee, Dillin was allowed to reenter and, in fact, given the keys back to the buildings. At Dillin's Chapter 13 creditor's meeting on November 19, 2003, Corrigan's attorney, Ron Logan, told Dillin that he had until the end of the month of November to remove all of the "Panel Town stuff" from the buildings.

On Monday, November 24, 2003, David Corrigan changed the locks on the buildings after being advised to do so by his father's attorney, Gerald Turner. On Wednesday, November 26, 2003, Dillin gained entry to the buildings despite the locks being changed and began removing his material from the buildings. Corrigan's son, acting on behalf of Corrigan, notified the police of the alleged break-in and there was a discussion regarding Dillin's access to the buildings. At the close of the discussion, Dillin was told that he would be able to return on Friday, November 28, 2003, and remove whatever inventory and items that remained. When Dillin arrived on Friday, he was greeted by Gerald Turner and was refused further entry into the buildings despite the fact that he clearly had inventory and personal property remaining there. To document

that forced lockout, Turner later sent a letter to Dillin's bankruptcy attorney stating that Corrigan considered the property abandoned and, adding insult to injury, suggesting that Dillin make arrangements to buy his own property from Corrigan. [Jt. Ex. 13.]

■■■ The claim of conversion is a state law claim. *See Nat. Equipment & Mold Corp. v. Metropolitan Bank of Lima (In re Nat. Equipment & Mold Corp.),* 64 B.R. 239, 244 (Bankr.N.D.Ohio 1986). In Ohio, "conversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *State ex. rel. Toma v. Corrigan,* 92 Ohio St.3d 589, 592, 752 N.E.2d 281 (2001) (quoting *Joyce v. General Motors Corp.,* 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990)); *Ohio Telephone Equipment v. Hadler Realty Co.,* 24 Ohio App.3d 91, 92, 493 N.E.2d 289 (1985). Ohio law recognizes two types of conversion. The first type is where the wrongful possessor properly acquires the property but then refuses to return it upon demand and the second is where the wrongful possessor simply unlawfully acquires the property. *Petefish v. Haselberger,* 2005 WL 2715634, at *3 (Ohio App.2005) (distinguishing *Tabar v. Charlie's Towing Service, Inc.,* 97 Ohio App.3d 423, 427–28, 646 N.E.2d 1132 (1994) which holds that to establish a claim of conversion, the plaintiff must establish that (1) he demanded the return of the property from the possessor after the possessor exercised control over it and (2) the possessor refused to deliver the property to the plaintiff after that demand).

■■■ Without needing to distinguish between the types of conversion, the court finds that Corrigan's actions, through his various agents, amounted to a blatant conversion. The specific date of the conversion was Friday, November 28, 2003 when Gerald Turner refused Dillin entry to the premises to collect the remainder of his material. By refusing to allow Dillin entry into the premises, and continuing to do so until the property was sold in April 2004, Corrigan took possession of the material and converted it for his own use.

Corrigan's own testimony and that of his agents' support this conclusion. The testimony clearly sets forth the time and manner of the lockout and conversion. No witness testimony at trial or evidence before the court refutes that conclusion. Moreover, Corrigan's attorney, Gerald Turner, sent a letter to Dillin's bankruptcy attorney on December 11, 2003 that verified the conversion took place. The letter not only verified the conversion itself, but showed that Corrigan had intentionally and unlawfully assumed control of Dillin's property by stating that Corrigan was willing to sell the property back to Dillin if arrangements could be made.

The letter of December 11, 2003 also provides a basis for Corrigan's main defense to the conversion claims—the argument that Dillin abandoned the Panel Town property. This defense simply fails.

■■■ In Ohio, abandoned property "is property over which the owner has relinquished all right, title, claim and possession with the intention of not reclaiming it or resuming its ownership, possession or enjoyment." *Doughman v. Long,* 42 Ohio App.3d 17, 21, 536 N.E.2d 394 (1987). "Abandonment requires affirmative proof of intent to abandon, coupled with acts or omissions implementing the intent." *See Davis v. Suggs,* 10 Ohio App.3d 50, 52, 460

N.E.2d 665 (1983). The intent to abandon property "must be shown by unequivocal and decisive acts indicative of abandonment." *Erie Metroparks Bd. Of Commrs. v. Key Trust Co. of Ohio,* 145 Ohio App.3d 782, 790, 764 N.E.2d 509 (2001).

 There is no evidence that Dillin intended to abandon the Panel Town property. In fact, the opposite is true. Dillin repeatedly attempted to collect his inventory and personal property from his former business before being locked out by Corrigan. He even went so far as to allegedly break into the premises. His attempts, however, were met with refusal from Corrigan's attorney and a lockout beginning on Friday, November 28, 2003.

Corrigan attempts to show that Dillin abandoned the property because there were no attempts to reacquire it between November 2003 and April 2004, but that argument fails for several reasons. First, Corrigan clearly believed the property was his on December 11, 2003 as is shown in the letter from his attorney. Thus, at that point, the deed was done and the property had been converted.

 In addition, a debtor's delay in attempting to retrieve already converted property does not show intent to abandon that property. *See Rucker v. Alston,* 2004 WL 1077843, at *3 (Ohio App.2004). In the *Rucker* case, the owner of the property, a car, had allowed a mechanic to hold the car without requesting its return for almost a year. The possessor mechanic held the car while he worked on it and then, when completed, demanded additional payment. The owner of the car refused to pay the additional sum and the possessor gained title to the vehicle illegally and sold it. The possessor then argued that the owner's silence during the time he held the car was evidence of abandonment. The court of appeals stated that the possessor "did not present evidence that [the owner] had discarded or thrown away all right to her car. At most, he claimed that he did not hear from [the owner] 'all summer' and that she did not pay any storage." *Id.*

The *Rucker* case is similar to the present case. As in *Rucker,* Dillin was silent for several months prior to attempting to regain the property. As with the court of appeals in *Rucker,* this court does not find that fact to be significant. The sheer fact that it took Dillin a few months to make further demands in the face of such blatant conversion does not indicate to this court that Dillin had given up ownership of the property.[2] In fact, Dillin's demand in April 2004 proves that he still believed the property was his, but was unsure up to that time how to best regain control of it.

*Rucker* is also similar to this case in that the issue of storage fees has been raised. In *Rucker,* the court of appeals indicated that if the wrongful possessor had notified the owner of the need for storage fees, then that would have been evidence that

---

**2.** At trial, Corrigan presented several cases to the court that he felt supported his position that Dillin's delay was indicative of abandonment. One case in particular was similar to the facts of the present matter. In *Markovich v. Hunt,* 1995 WL 25337 (Ohio App.1995), the court found that a tenant who moved out of a residential apartment leaving items behind had abandoned the property. The *Markovich* case is distinguishable, however, in that the tenant left the residence unlocked and could have taken the property at any time. That is vastly different from the situation here. As the court has stressed, Corrigan's agent locked Dillin out of the buildings. In fact, the court surmises that if Dillin had been allowed access into the buildings in late 2003, this suit would never have been filed.

the wrongful possessor had not intended conversion. In the same vein, Corrigan has argued that his request for, and Dillin's refusal to pay, storage fees in April 2004 is evidence that Dillin abandoned the property.

The court finds this argument unconvincing. Corrigan clearly evidenced his intentional conversion in December 2003 when he offered to sell the property back to Dillin as opposed to making demand for storage fees. Only after four months had passed and Dillin had hired an attorney did Corrigan respond with the demand for storage fees in order to release the property to Dillin. This was at a time when Corrigan wanted the then damaged property out so that he could resell the buildings to another purchaser. More importantly, however, it was at a time after Corrigan had converted the property by refusing Dillin access to it.

In addition to his arguments regarding the delay in time and the storage fees, Corrigan also presented a significant amount of evidence that Dillin had indicated in other ways that he was abandoning the Panel Town property. This evidence included the fact that Dillin was not keeping up with the utility payments on the premises and that the premises was a mess in late November 2003. Corrigan not only provided these arguments in support of the abandonment issue, but also in support of his version of the valuation of the converted property.

The court will address the valuation issues below, but finds here that the evidence as to the alleged abandonment was not convincing. Dillin clearly had financial troubles in the months leading up to the conversion. He was in personal bankruptcy and had actually been locked out of the premises between the sheriff's sale and

mid-October 2003. While the court agrees that Dillin's upkeep of the premises was substandard, that does not provide Corrigan with the right to take and hold the property that was still rightfully Panel Town's. Moreover, the fact that the premises were "a mess" after Dillin was rushing to remove his inventory and equipment before being forcibly locked out of the premises is of no consequence. In fact, the court would expect the premises to be in disarray in the hustle to remove the inventory under such circumstances.

■ Corrigan converted the Panel Town property on November 28, 2003 when Dillin was refused entry to the building. The evidence shows that Corrigan seized control of the building and refused Dillin the time to remove the Panel Town inventory and equipment. Corrigan argues that Dillin abandoned the property because of his delay in proceeding with formal action. Although Dillin's delay is inexplicable, the legal standard for abandonment in Ohio requires evidence of the intent to abandon property to be "direct, affirmative, or reasonably beget the exclusive inference of throwing away." *Rucker*, 2004 WL 1077843, at *3. None of the evidence shows that Dillin had the necessary intent to abandon this property. In fact, it is the opposite. Dillin clearly wanted to remove the property from the premises, but Corrigan did not allow that removal.

### B. Damages for the Conversion of Dillin's Panel Town Property

■ Damages in a conversion action are determined as the fair market value of the converted property at the time of the conversion. *See Tabar*, 97 Ohio App.3d at 428, 646 N.E.2d 1132. In this case, the court has determined that Corrigan's conversion of the property took place on No-

vember 28, 2003 when Dillin was locked out of the premises. Thus, the remaining issue is what the Panel Town inventory and equipment was reasonably worth on that day.

The parties present vastly different accounts of the make up, condition, and treatment of the Panel Town inventory and property between November 2003 through Corrigan's sale of it in April 2004, which the court will briefly summarize here.

Dillin presented the court with an exhibit listing all of the inventory and goods that he claimed was in the Panel Town buildings in November 2003. [Jt. Ex. 17.] The exhibit was created in November 2003 but dated December 2003 during the time after Dillin had been locked out of the buildings. The exhibit is in good order, itemizes the inventory, and provides a value for each item. The total value associated with Dillin's inventory list is $107,172.92. Dillin also provided testimony, supported by the testimony of Corrigan's witnesses, that the buildings contained personal property in the nature of office equipment and machinery. Dillin alleges that the value of this inventory is $14,000.00.

Dillin testified at trial that the inventory was in good, saleable condition when he last saw it in November 2003 and that the personal property was in working order as well. In support of Dillin's testimony, Roger Beckstein, the wholesaler who sold Dillin the inventory, testified that he had seen the inventory in place and in good condition when the store was operating in 2003. Beckstein's memory of when he viewed the material was vague. He first said it was in November, but on cross-examination he was unsure and admitted it could have been in the summer of 2003,

possibly June. His testimony on this point is inconclusive. Beckstein also testified that Dillin's pricing on the inventory list was reasonable for saleable material. In addition, Frank Neil, a former employee of Dillin's who continues to work in the flooring industry, testified that at least some of the inventory was in place when he peered through the windows of the buildings in December 2003.

Dillin finally states that he did not see the inventory between November 2003 and April 2004 when the parties began negotiations for the release of the inventory. In April, Dillin found that much of the inventory was not present and the remainder was in poor condition. In fact, Dillin found the inventory so lacking and in such poor condition that he was unwilling to pay $3,000.00 for its release even though he originally valued the inventory at more than $100,000.00.

Corrigan and his witnesses tell a very different story. Corrigan's son, David, who was present at the buildings in November 2003, stated that the buildings were in shambles. Not only were they unkempt, but they were in fact trashed. The shelving was in disarray, the toilets were unflushed, the water turned off, and at least some of the inventory was already water damaged.

The parties appear to agree on one set of facts. In April 2004, Corrigan was planning on reselling the buildings and had a group of workers, led by another of his sons, Kelly, clean out the buildings. The workers testified and Dillin did not attempt to dispute, that the buildings, inventory, and personal property on the premises were severely damaged at that time. The buildings were leaking water on the inventory and there was an oil spill that had contaminated at least some of the

inventory. The witnesses also testified that other than a forklift and pallet jack that were clearly operational, all of the office equipment was useless junk.

The parties also agree that the working party placed much of what they found in the buildings in a dumpster for disposal. This included the office equipment and apparently much of the inventory. Although to a witness, the people that cleaned out the buildings testified that everything they threw out was clearly useless, none of them indicated having any knowledge whatsoever of the condition of the buildings or anything in them prior to April 2004.

Finally, both parties presented the testimony and written estimates of experts regarding the inventory that Corrigan sold to Frank Harlow for $5,000.00 in April 2004. Harlow apparently kept the inventory whole until November 2005 when the experts were able to view it together in preparation for this litigation. Corrigan's witness estimated the value of the inventory and remaining equipment, including the forklift and pallet jack, at $8,300.00. Dillin's expert valued the same inventory and equipment at $17,900.00. Unfortunately, as with the work crew that removed the inventory and goods from the buildings, the experts could provide no valuation of the inventory and goods as of November 2003 when Dillin was locked out of the buildings.

Thus, the court was faced with questions regarding not only the simple valuation of goods, but whether those goods were actually in place in November 2003 and in what condition the goods were, if they were in place. In evaluating the entirety of the testimony and written evidence, the court is mindful of the fact that it was Dillin's burden to prove his loss. Once that was done, however, the burden shifted to Corrigan to refute the plain testimony and written evidence provided by Dillin.

### 1. Damages Calculation

In the court's evaluation of the evidence, Dillin met his initial burden on the value of the Panel Town Property. He provided a clear and precise listing of the inventory that he reasonably believed was on the premises at the time he was locked out. He also provided the testimony of two witnesses, Roger Beckstein and Frank Neil, who said that Dillin's valuation was proper and that they both witnessed at least some of the inventory in good saleable condition at the time.

Although Corrigan did little to directly refute Dillin's proof of the value of the Panel Town Property, he did provide a significant amount of conflicting testimony from very credible witnesses. David Corrigan testified that Dillin removed material during the time before November 24, 2003 and on Wednesday, November 26, 2003. He also testified that there was a significant amount of trash in the dumpster that appeared to be material Dillin was throwing away. David, Edward, and Kelly Corrigan all testified that the buildings were in poor condition during the November timeframe.

In addition, the court finds it disconcerting that Dillin presented a handwritten list of material that makes little, if any, sense to anyone but himself as his primary proof of the value of the Panel Town Property. He also claims that the list was made in November 2003, but it is clearly dated December 2003. Moreover, he provided no back up material in the form of receipts, shipping labels, or any other solid evidence showing that the list was not his pure creation.

What Dillin did do is point to a time when Corrigan was having the buildings cleaned out and insinuate that Corrigan threw away material valued at nearly $100,000.00. It challenges credulity to believe that Corrigan's clean up crew would throw away that much material—including full boxes and bottles of supplies.

Dillin did not, however, admit to taking any material out of the buildings prior to November 24, 2003. This was so despite the fact that David Corrigan stated with specificity that he observed people moving material out of the buildings the week of November 24, 2003 and that Dillin had moved a significant portion of his inventory out of the buildings prior to that time.

In addition, the court is mindful that Dillin took no action for several months after it had been converted. To the court, this is a strong indication that Dillin did not truly feel that the inventory was worth $100,000.00. Surely if it was worth reclaiming, Dillin would have acted earlier or perhaps to him it was not worth the expense to recover. So while the delay does not affect the legal conversion issue, it certainly affects the court's opinion of Dillin's view of the Panel Town Property.

Yet, Corrigan clearly converted the Panel Town Property. Not only did he lock Dillin out of the premises in November 2003 and thereby convert Dillin's property making it unable for Dillin to do business in any way, but he did not even care to reasonably document the condition and amount of inventory that he converted. The one fact that the testimony regarding the condition of the material in April 2004 does support is that, in one way or another, the inventory and equipment were damaged after Corrigan had converted it. Thus, while Corrigan had total and complete control of the inventory because he had refused Dillin entry into the buildings, the inventory and goods were damaged, in some cases, beyond repair. The damage was so extensive that when Dillin finally got back into the buildings in April 2004, he refused to pay $3,000.00 for the release of inventory that he had valued at over $100,000.00 just three months earlier.

Corrigan himself testified as to the lack of care for Dillin's inventory and goods by stating that he did not account for or care for the material. He even stated clearly that he felt that it was not his to care for. While the court realizes that Corrigan may have been the victim of his attorney's arbitrary and capricious actions in the lockout process and respects Corrigan's proven business acumen, the court also notes that Corrigan was wrong in his interpretation of the result of the lockout. Corrigan took control of the Panel Town inventory and goods and is responsible for that material after the conversion.

Thus, the court finds that the damages for Corrigan's conversion of the Panel Town property should be calculated from November 28, 2003, the day that Dillin was refused entry into the premises. As to the value of the material left in the buildings, Dillin provided the court with a breakdown of the inventory with values attached. [Jt. Ex. 17.] Dillin's expert testified that the values on that breakdown were reasonable. Dillin, however, created that inventory list almost a month after the conversion. Corrigan, however, presented no evidence that directly controverted Dillin's claim. The testimony regarding the upkeep of the premises in November 2003 through April 2004 was inconclusive to such an extent that Dillin's testimony was never placed in doubt. In fact, the testimony regarding the clean up of the buildings in April 2004 only proved that Corrigan did not provide

reasonable care for material that he had converted from Dillin.

In the end, the court found itself left with evidence of vastly different valuations presented by the parties—a situation similar to another of the abandonment cases presented by the parties. In *Davis v. Suggs*, 10 Ohio App.3d 50, 52, 460 N.E.2d 665 (1983), an Ohio court of appeals addressed a case where the parties were equally at fault for the damages and loss of value of the allegedly abandoned property. In determining the value of the property, lower court had decided that both parties were at fault because of the long silence after the original conversion and granted a judgment for half of the value of the property. The court of appeals stated in upholding the lower court's opinion that "[a]s both parties were silent, the court below was certainly justified in finding that the parties were equally responsible for the loss." *Davis*, 10 Ohio App.3d at 52, 460 N.E.2d 665.

Like the *Davis* case, the court finds that both parties in this case were at fault for the loss of value in the Panel Town Property. It is clear that Dillin believes that he provided an accurate picture of the inventory in Exhibit 17, yet he failed to explain his delay in attempting to reclaim the property. It is also clear that Corrigan converted the property in November 2003 and did not care for it in any way between then and April 2004.

Dillin's value of the Panel Town Property as of Nov. 28 2003 was $107,172.92 based on the inventory listing he provided. Dillin claimed that his office equipment and machinery should be valued at $14,000.00. These figures are subject to a

decrease because of the nature of used office equipment and machinery. While the court agrees with the valuation of the forklift at $5,000.00 and the pallet jack at $100.00, the court finds that little value can be placed on the remaining office equipment even if that equipment was carelessly thrown away by Corrigan. The office equipment, including the phone system and storage racks, will be valued at a total of $2,000.00. Thus, an acceptable market value of the Panel Town property, including the inventory, office equipment, and machinery as of November 28, 2003 is $114,272.92.[3]

Yet, the parties will share the fault in this loss. Although it is possible that Corrigan's clean up team threw out a significant amount of material in April 2004, it is also possible that Dillin removed that material prior to November 2003. The only material that the court is certain was in the buildings when Dillin was locked out is that material that remains in storage with Harlow today. The court spent an extensive amount of time comparing the lists of the experts regarding that material with Dillin's inventory list and that comparison led to one simple conclusion, much of Dillin's inventory is gone and the court finds that neither party presented enough credible evidence to prove where all of that inventory went. Corrigan's friends threw away much in their rush to clear the buildings on April 24, 2004, and Dillin may have moved some part of it before the locks were changed and again on Wednesday, November 24, 2003. Thus, the parties share the fault and the financial burden of the loss.

The court will order a judgment for conversion against Corrigan for $57,136.46,

---

**3.** To clarify, this figure represents the inventory ($107,172.92), the forklift ($5,000.00), the pallet jack ($100.00), and the remaining office equipment ($2,000.00).

an amount which is one half of the value of the Panel Town property on November 28, 2003.

## 2. Loss of Profits Calculation

In addition to damages for the conversion of the inventory, Dillin requested the court grant damages for loss of profits. Dillin specifically requested lost profits in the amount of 100% of the value of the inventory. Dillin reached this figure by arguing that he would have been able to turn over the inventory at least twice during the time that he has been without the inventory and that each time he turned over the inventory he would have made 50% above cost on the inventory sold. Thus, he argues, he could have made 50% of the value of the inventory twice or 100% of the value of the inventory over one year's time.

This figure is at least in part supported by the experts who testified regarding the flooring business. Beckstein stated that a 40% to 45% markup was normal for Dillin's industry and Jerry Vollmer stated that the mark up varied widely but could range from 10% to 40% depending on the type of material sold and services associated with the sale of that material. Both experts also agreed that it would be normal for inventory to turn over twice in one year.

The court finds that Dillin should be compensated for a loss of profits on the inventory. This is particularly true in this case where the inventory has lost almost all of its value since the conversion and, in truth, has been sold to a third party and the rest disposed of as trash. The court will not, however, award damages for Dillin for lost profits in the amount that he requested. When asking for a double turnover at 50% profit margin on the inventory, Dillin forgets that Panel Town as a business was failing at the time the inventory was converted. He was in personal bankruptcy and the store itself was clearly not making the maximum amount of profit. Moreover, neither expert stated that a 50% profit margin was usual for the industry and Vollmer specifically stated that a cash and carry business usually makes between 10% and 25% profit margin.

Thus, the court will award Dillin damages for lost profits in the amount of 40% of the value of the inventory. Although Corrigan converted the inventory, destroyed part and sold part of it, the court simply will not give Dillin damages for a potential double turn over of the inventory in one year. The amount of damages for the lost profits will be set at 40% of $107,172.92, or $42,869.17.

The total amount of damages assessed for Corrigan's conversion of the Panel Town inventory and personal property and the lost profits is $100,005.63. Judgment will be entered against Corrigan for that amount.

## C. Del Norte Security Interest

Del Norte Refinance, LLC, a creditor that claims a valid security interest in the Panel Town property, filed a counter claim against Corrigan for the value of the property converted. This claim has been complicated by the fact that Corrigan requested and the court granted summary judgment in this case on the issue of whether Corrigan could set off any judgment against him in this matter with a previously entered certified state court judgment against Dillin personally. By ruling that Corrigan could set off any judgment against him with the state court judgment valued at over $200,000.00, the

court essentially made Del Norte the only party with any financial interest in whatever judgment this court granted against Corrigan for the conversion.

The court will address that specific compilation in Section III of this opinion, but must first determine whether Del Norte held a valid security interest in the Panel Town property at the time of the conversion.

■ Del Norte claims that its security interest in valid based on the following set of facts. On February 6, 2003, Panel Town of Dayton, Inc. gave CDC Appliances, Inc. dba Ohio Valley Flooring a security interest in all of its inventory and equipment. Dillin executed the security agreement on behalf of Panel Town of Dayton, Inc. On March 14, 2003, CDC Appliances perfected its security interest in all of Panel Town of Dayton, Inc.'s inventory and equipment by filing a financing statement with the Ohio Secretary of State.

On April 24, 2004, CDC Appliances assigned its rights in the February 6, 2003 security agreement to Hamdi A. Soliman. On May 7, 2004, Soliman executed and delivered a subordination agreement to Del Norte, [Jt. Ex. 4], stating in part at paragraph 3 that Soliman:

> "hereby transfers and assigns and grants a security interest to [Del Norte] in all notes, claims or demands, and all monies due or to become due thereon of [Soliman] against [Panel Town] and all mortgages, liens, security interests and other property held by [Soliman] as security for the payment thereof ...."

[Jt. Ex. 4.] Based on that chain of events, Del Norte claims that it holds a valid perfected security interest in the Panel Town property dating back to the filing of the CDC financing statement on March 14, 2003, nine months before Corrigan converted the Panel Town property.

Corrigan argues, however, that Del Norte's does not have a valid security interest as of that date. First, he argues that the subordination agreement executed by Soliman does not contain an assignment of Soliman's security interest in the Panel Town property. The court disagrees. The plain language of the Subordination Agreement is clear. Soliman's security interest in Panel Town's property was assigned to Del Norte. While the court recognizes that the transfer could have been more readily identified in the document itself, it is apparent to the court that the intent and plain language of the document assigns Soliman's security interest to Del Norte.

Corrigan also argues that the March 14, 2003 financing statement is seriously misleading under Ohio law. The basis for this argument is that the financing statement utilizes the name Panel Town of Dayton, Inc. instead of Douglas Dillin or Ultimate Flooring or any number of other names that Dillin identified as his businesses during the time he was occupying the buildings in Troy.

While the court agrees that Dillin was not careful in his use of trade names and his failure to identify Panel Town on the land contract with Corrigan, the court cannot find that the March 14, 2003 financing statement is seriously misleading. The Ohio Revised Code requires that a financing statement provide the name of the debtor. When CDC entered into the security agreement with Panel Town, they entered the proper name of Panel Town of Dayton, Inc. on the financing statement. Moreover, the records of the Secretary of State of Ohio dated October 30, 2000 con-

firm that Panel Town of Dayton, Inc. was the registered name for Panel Town.

Corrigan argues, however, that because Dillin never used the name Panel Town on the store while he was in operation or on the contract with Corrigan that there was no way for Corrigan to know that Panel Town was the debtor and no way to search for any potential security interests on the Panel Town Property before he sold it to Frank Harlow.

The court finds this argument unavailing. The fact is that Corrigan converted the property from Dillin and sold it four months later to Harlow for less that 10% its original value and only then because he needed to clean up his buildings prior to reselling them. Corrigan provided no testimony or evidence that he made any attempt to learn if the Panel Town Property was secured by any party. Moreover, if he had made such an attempt, he could have identified Dillin as an officer of Panel Town in the Secretary of State records and then would have had reason to search under the Panel Town name. There is simply no way that this court could find the March 14, 2003 financing statement seriously misled Corrigan, who wrongfully converted the property and then sold it without any attempt to find out if the property was secured.

Through a valid subordination agreement and a properly filed financing statement, Del Norte had a valid and enforceable security interest in Panel Town's inventory as of March 14, 2003. Corrigan has called into question both the validity of the subordination agreement and the efficacy of the financing statement. The subordination agreement clearly states that Del Norte was assigned all rights in the security interest on the Panel Town property and the fi-

nancing statement is in no way seriously misleading since Panel Town of Dayton, Inc. was the listed debtor on the statement. Del Norte's interest in the property dates back to March 14, 2003, almost 9 months before the conversion took place.

### III. Corrigan's Set Off

 As the court discussed above, Corrigan moved to strike all of the discussions regarding the set off issues. Corrigan does so, however, while still arguing those issues that were brought to the court's attention by Del Norte in its closing arguments.

The court has already ruled that Corrigan could offset any damages adjudged against him in this matter with the certified judgment from the state court in the amount of $207,000.00. The court made that finding without the complete facts regarding the certified judgment and Corrigan's mitigation efforts.

Although the court cannot and will not overturn the state court issued certified judgment, the court notes that the judgment was issued utilizing an utterly incorrect interpretation of the law and without regard for the Ohio law, specifically Ohio Revised Code sections 5313.06, .07, and .10. In addition, the court now has knowledge that Corrigan has mitigated a vast majority of his claims against Dillin, yet still inexplicably seeks to utilize those claims as a setoff in this proceeding. Specifically, Corrigan has not recognized a credit against the judgment for the $315,000.00 to $325,000.00 he received from the sale of the buildings to a second buyer or the $5,000.00 that he received from the sale of the Panel Town property.

This the court will not allow. In its capacity as a court of equity, the court

reiterates that Corrigan may offset his claims against the damages for conversion, but finds that Corrigan may only offset the amount of his claims that exceed the amounts he has received from other sources in mitigation of his judgment. That amount is to be adjudged at a later date.

On this issue, the court will set a telephone conference to discuss future proceedings in this matter.

### IV. Conclusion

The court finds that Corrigan converted Dillin's Panel Town property. Dillin, however, delayed his attempts to reclaim that property and the evidence was inconclusive regarding the true value of the property. The court orders judgment against Corrigan for the conversion in an amount that is one half of Dillin's claim for the property because each party was at fault after the conversion. Judgment is ordered against Corrigan for $57,136.46 based on the loss of the Panel Town equipment and inventory.

The court also finds that Dillin should receive compensation for his loss of profits. The court finds that Dillin was damaged in the amount of $42,869.17 in lost profits and orders judgment against Corrigan in that amount. The total amount of the judgment against Corrigan is $100,005.63.

The court finds that Del Norte holds a valid security interest in the Panel Town property and held that interest as of March 14, 2003, nine months prior to Corrigan's conversion of the Panel Town Property. Because of that interest, Del Norte is a joint party with Dillin on the judgments against Corrigan.

The court has reiterated that Corrigan has a set off against Panel Town based on the state court judgment against Dillin because Dillin is legally Panel Town's alter ego. The court finds, however, that Corrigan can only set off that amount of the judgment that has not been mitigated from other sources.

The court sets a telephone conference to consider further proceedings regarding Corrigan's mitigation of the state court judgment for Wednesday, February 15, 2006 at 9:30 a.m.

**It is so ordered.**