**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Corban v. Chesapeake Exploration, L.L.C.,* **Slip Opinion No. 2016-Ohio-5796.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-5796

CORBAN *v*. CHESAPEAKE EXPLORATION, L.L.C., ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Corban v. Chesapeake Exploration, L.L.C.,* Slip Opinion No. 2016-Ohio-5796.]**

*Dormant Mineral Act—R.C. 5301.56—2006 version of Dormant Mineral Act applies to all claims asserted after June 30, 2006—Payment of delay rental is neither a title transaction nor a saving event.*

(No. 2014-0804—Submitted May 6, 2015—Decided September 15, 2016.)

ON ORDER from the United States District Court for the Southern District of Ohio, Eastern Division, Certifying Questions of State Law, No. 2:13-cv-246.

————————————

**O'DONNELL, J.**

{¶ 1} The United States District Court for the Southern District of Ohio, Eastern Division, submitted two certified questions of Ohio law in accordance with S.Ct.Prac.R. 9.01:

1. Does the 2006 version or the 1989 version of the [Dormant Mineral Act] apply to claims asserted after 2006 alleging that the rights to oil, gas, and other minerals automatically vested in the surface land holder prior to the 2006 amendments as a result of abandonment?

AND

2. Is the payment of a delay rental during the primary term of an oil and gas lease a title transaction and "savings event" under the [Dormant Mineral Act]?

**{¶ 2}** For the following reasons, we conclude that the 2006 version of the Dormant Mineral Act, which is codified at R.C. 5301.56, applies to all claims asserted after June 30, 2006, and that a payment of delay rental is neither a title transaction nor a saving event.

## Facts and Procedural History

*Transfers of the Surface Estate*

**{¶ 3}** In July 1959, the North American Coal Corporation conveyed the surface rights to 164.5 acres of land in Harrison County, Ohio, to Orelen H. Corban and Hans D. Corban, reserving to itself all oil, gas, and mineral rights. Orelen quitclaimed his interest in the surface estate to Carol Ann Corban in 1962, and she and her husband conveyed that share of the surface rights to Hans in 1967 by quitclaim deed, making him the sole owner of the surface rights. Hans transferred the property to Gretchen Corban by quitclaim deed in 1980, and she quitclaimed the property to Hans Michael Corban in 1999 through a deed expressly "subject to conditions, restrictions and easements if any, contained in prior instruments of record."

*Transactions Relating to the Mineral Interests*

{¶ 4} In January 1974, North American Coal leased its oil and gas rights to the National Petroleum Corporation, and that entity recorded the lease but assigned it to the American Exploration Company, which obtained a drilling permit and assigned the lease in 1978 to C.E. Beck, acting for and on behalf of RSC Energy Corporation. No production of oil or gas resulted, however, and that lease terminated in 1984.

{¶ 5} In January 1984, North American Coal leased the oil and gas rights to Beck, and that lease was recorded. RSC Energy then obtained a drilling permit, and Beck assigned his lease to Carless Resources, Inc., in an assignment recorded in May 1985. No production of oil or gas occurred, however, but North American Coal did receive delay rental payments in 1985, 1986, 1987, and 1988. That lease expired in January 1989.

{¶ 6} Sometime before the lease expired, North American Coal changed its name to the Bellaire Corporation, and Bellaire conveyed the mineral estate to the North American Coal Royalty Company in 2008.

{¶ 7} In January 2009, North American Coal Royalty leased its oil and gas rights to the Mountaineer Natural Gas Company, which recorded the lease and assigned it to Dale Property Services Penn, L.P., in May 2010. That October, it assigned the lease to Ohio Buckeye Energy, L.L.C., reserving a royalty interest that it later assigned to Dale Pennsylvania Royalty, L.P. An oil and gas well was drilled, and it began production in June 2011.

{¶ 8} Ohio Buckeye Energy transferred a portion of its interest in the lease to Larchmont Resources, L.L.C., in October 2011 and another part of the interest to CHK Utica, L.L.C., the next month. In December 2011, Ohio Buckeye Energy merged with Chesapeake Exploration, L.L.C., which transferred part of the remaining interest to Total E&P USA, Inc.

*Procedural History*

{¶ 9} In 2013, Hans Michael Corban filed this action in the Harrison County Common Pleas Court against North American Coal Royalty, CHK Utica, Chesapeake Exploration, and Total E&P USA, seeking to quiet title to the oil and gas rights under his surface lands and requesting a declaratory judgment, a permanent injunction, and compensation for conversion. The defending parties removed the matter to federal court on the basis of diversity jurisdiction and counterclaimed for a declaratory judgment and to quiet title in their favor. Corban amended the complaint to add Dale Pennsylvania Royalty and Larchmont Resources as parties and to bring a claim for unjust enrichment.

{¶ 10} The parties moved for summary judgment; the district court concluded that its ruling on those motions required a clarification of two areas of Ohio law: (1) whether the 1989 or the 2006 version of R.C. 5301.56, the Dormant Mineral Act, should be applied to a quiet title action filed after 2006 that asserts that the rights to minerals vested in the surface owner as a result of abandonment prior to 2006 and (2) whether the payment of delay rental during the term of an oil and gas lease constituted a title transaction. The district court certified these questions to our court, and we agreed to answer them. *Corban v. Chesapeake Exploration, L.L.C.*, 139 Ohio St.3d 1482, 2014-Ohio-3195, 12 N.E.3d 1228.

**Positions of the Parties**

{¶ 11} Corban contends that the 1989 version of R.C. 5301.56 is self-executing because nothing in the statute required any affirmative action or judicial confirmation establishing that the mineral interest had been deemed abandoned and vested in the owner of the surface estate and the legislature intended the statute to encourage development by extinguishing unused mineral interests. He notes that although the General Assembly largely adopted the Uniform Dormant Mineral Interests Act in enacting R.C. 5301.56 in 1989, it rejected the uniform act's requirement that the claimant file an action to terminate the dormant mineral

interest. Corban notes that the United States Supreme Court has upheld statutes that automatically extinguish mineral interests without advance notice to the owner against various constitutional challenges, and because the 1989 version of R.C. 5301.56 was self-executing and afforded him a vested right in the minerals under his land, he contends, the General Assembly cannot retroactively extinguish that right. He concludes that because the surface and mineral estates vested in him prior to the 2006 amendment to R.C. 5301.56, it does not apply to him.

{¶ 12} Regarding the second certified question, Corban urges us to hold that a delay rental payment is not a "title transaction" as defined by R.C. 5301.47(F). He maintains that an oil and gas lease is not a title transaction, because it grants a license to prospect for minerals but does not transfer any interest in real property and cannot affect an interest in land, and therefore an action taken by a lessee to extend the life of that lease by making delay rental payments is not itself a title transaction. He also notes that the 117th General Assembly rejected language in the Uniform Dormant Mineral Interests Act and in the 1989 act as introduced in the legislature that would have expressly provided that an oil and gas lease is a saving event. But even if the expiration of a lease or a delay rental payment were a title transaction, he explains, neither suffices to preserve the mineral interest if not recorded.

{¶ 13} In separately filed briefs, North American Coal Royalty and Chesapeake Exploration, CHK Utica, Dale Pennsylvania, Larchmont Resources, and Total E&P USA assert that the 1989 law was not self-executing, because that statute *deemed* dormant mineral interests abandoned and vested in the surface owner without expressly extinguishing them or declaring them null and void, and the legislature therefore intended the surface owner to take legal action to obtain ownership of the mineral interest. These parties note that the General Assembly codified the 1989 law as a supplement to the Marketable Title Act, R.C. 5301.47 et seq., which was intended to simplify and facilitate land title transactions by

allowing reliance on the record chain of title. But automatic vesting, they note, would occur outside the chain of title and would be in derogation of the common law presumption against a forfeiture. They claim that because Corban took no action to obtain record title to the mineral interest, North American Coal Royalty remained the record title holder, and after June 30, 2006, Corban was required to use the procedures enacted by the 2006 amendment to R.C. 5301.56 to perfect his claim to the mineral estate. And applying the 2006 amendment to his claim does not retroactively extinguish a vested right but rather provides new procedures to perfect that right.

{¶ 14} Further, these parties contend that the dates and amounts of any necessary delay rental payments are set forth in the recorded oil and gas lease and that recording the lease put the world on notice of its terms and gave a title searcher all the information needed to determine whether the payment of delay rentals occurred to extend the lease. In addition, they maintain that a payment of delay rental prevents ownership of oil and gas from reverting to the lessor and therefore is a title transaction because it affects title to the oil and gas and provides notice that the mineral estate holder has not abandoned the mineral rights.

### Dormant Mineral Interests

{¶ 15} At common law, mineral rights severed from the surface estate were not subject to abandonment or termination for the failure to produce oil or gas or to extract other minerals. 1A Summers, *The Law of Oil and Gas*, Section 8.4, at 139 (3d Ed.2004). Abandonment of an interest in real property required proof of the owner's intent to abandon it, and it therefore could not be presumed from mere nonuse. *Gill v. Fletcher*, 74 Ohio St. 295, 305, 78 N.E. 433 (1906); *Kiser v. Logan Cty. Bd. of Commrs.*, 85 Ohio St. 129, 131, 97 N.E. 52 (1911); *W. Park Shopping Ctr., Inc. v. Masheter*, 6 Ohio St.2d 142, 144, 216 N.E.2d 761 (1966); *Beer v. Griffith*, 61 Ohio St.2d 119, 121, 399 N.E.2d 1227 (1980).

**{¶ 16}** Over time, mineral rights were fractionalized through devise, descent, and conveyance, and parties seeking to develop a mineral interest often had difficulty identifying and locating its owners. *See generally Dodd v. Croskey*, 143 Ohio St.3d 293, 2015-Ohio-2362, 37 N.E.3d 147, ¶ 7; *Van Slooten v. Larsen*, 410 Mich. 21, 45-46, 299 N.W.2d 704 (1980); 1A Summers, *The Law of Oil and Gas*, Section 8.4, at 139-140.

*The Marketable Title Act*

**{¶ 17}** The General Assembly enacted the Marketable Title Act, R.C. 5301.47 et seq., in 1961, Am.H.B. No. 81, 129 Ohio Laws 1040, to extinguish interests and claims in land that existed prior to the root of title with "the legislative purpose of simplifying and facilitating land title transactions by allowing persons to rely on a record chain of title." R.C. 5301.55. This legislation provides that marketable record title—an unbroken chain of title to an interest in land for 40 years or more, R.C. 5301.48—"shall be held by its owner and shall be taken by any person dealing with the land free and clear of all interests, claims, or charges whatsoever, the existence of which depends upon any act, transaction, event, or omission that occurred prior to the effective date of the root of title." R.C. 5301.50. Marketable record title therefore "operates to extinguish" all other prior interests, R.C. 5301.47(A), which "are hereby declared to be null and void," R.C. 5301.50.

**{¶ 18}** When initially enacted, the Marketable Title Act did not "bar or extinguish any right, title, estate, or interest in and to minerals, and any mining or other rights appurtenant thereto or exercisable in connection therewith." Former R.C. 5301.53(E), 129 Ohio Laws at 1046. However, the General Assembly amended former R.C. 5301.53 and former R.C. 5301.56 in 1973 "to enable property owners to clear their titles of disused mineral interests." Am.S.B. No. 267, 135 Ohio Laws, Part I, 942-943. Thus, the Marketable Title Act extinguished oil and gas rights by operation of law after 40 years from the effective date of the root of title unless a saving event preserving the interest appeared in the record chain of

7

title—i.e., the interest was specifically identified in the muniments of title in a subsequent title transaction, the holder recorded a notice claiming the interest, or the interest "[arose] out of a title transaction which has been recorded subsequent to the effective date of the root of title." R.C. 5301.48 and 5301.49.

*The 1989 Dormant Mineral Act*

{¶ 19} The General Assembly again amended the Marketable Title Act in 1989 when it enacted the Dormant Mineral Act, Sub.S.B. No. 223, 142 Ohio Laws, Part I, 981, 985-988 ("S.B. 223") "to provide a method for the termination of dormant mineral interests and the vesting of their title in surface owners, in the absence of certain occurrences within the preceding 20 years." 142 Ohio Laws, Part I, at 981.

{¶ 20} The 1989 law, codified in former R.C. 5301.56, stated: "Any mineral interest held by any person, other than the owner of the surface of the lands subject to the interest, shall be deemed abandoned and vested in the owner of the surface," unless (a) the mineral interest was related to coal, (b) the interest was held by the United States, the state of Ohio, or another political body described in the statute, or (c) one or more of the following saving events had occurred within the preceding 20 years:

(i) The mineral interest has been the subject of a title transaction that has been filed or recorded in the office of the county recorder of the county in which the lands are located;

(ii) There has been actual production or withdrawal of minerals by the holder from the lands, from lands covered by a lease to which the mineral interest is subject, or, in the case of oil or gas, from lands pooled, unitized, or included in unit operations, under sections 1509.26 to 1509.28 of the Revised Code, in which the mineral interest is participating, provided that the instrument or

8

order creating or providing for the pooling or unitization of oil or gas interests has been filed or recorded in the office of the county recorder of the county in which the lands that are subject to the pooling or unitization are located;

(iii) The mineral interest has been used in underground gas storage operations by the holder;

(iv) A drilling or mining permit has been issued to the holder, provided that an affidavit that states the name of the permit holder, the permit number, the type of permit, and a legal description of the lands affected by the permit has been filed or recorded, in accordance with section 5301.252 of the Revised Code, in the office of the county recorder of the county in which the lands are located;

(v) A claim to preserve the interest has been filed in accordance with division (C) of this section;

(vi) In the case of a separated mineral interest, a separately listed tax parcel number has been created for the mineral interest in the county auditor's tax list and the county treasurer's duplicate tax list in the county in which the lands are located.

Former R.C. 5301.56(B)(1), S.B. 223, 142 Ohio Laws, Part I, at 985, 986-987.

{¶ 21} Notably, in contrast to R.C. 5301.47(A) and 5301.50 of the Marketable Title Act, the 1989 law did not use the word "extinguish," nor did it declare dormant mineral interests "null and void." Rather, it provided that dormant mineral interests "shall be deemed abandoned and vested in the owner of the surface." The word "deem" means "[t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have." *Black's Law Dictionary* 504 (10th Ed.2014).

**{¶ 22}** As the Sixth Circuit Court of Appeals has explained, "[c]ourts construing the meaning of the word 'deemed' when used in a statute have been nearly unanimous in concluding that a conclusive presumption is created." *Mun. Resale Serv. Customers v. Fed. Energy Regulatory Comm.*, 43 F.3d 1046, 1053 (6th Cir.1995); *see, e.g., Rowe v. New Hampshire Motor Transport Assn.*, 552 U.S. 364, 372, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008) (statute's " 'deemed to know' provision * * * creates a conclusive presumption of carrier knowledge"); *Ohio Power Co. v. Fed. Energy Regulatory Comm.*, 954 F.2d 779, 783 (D.C.Cir.1992) (word "deemed" in regulation establishes conclusive presumption); *Butts v. Bysiewicz*, 298 Conn. 665, 684, 5 A.3d 932 (2010) ("it is apparent that this term ['deem'] can indicate a conclusive presumption"); *Hutchinson Technology, Inc. v. Commr. of Revenue*, 698 N.W.2d 1, 13 (Minn.2005) (" 'in our statutes the word "deemed" appears to be treated as creating a conclusive presumption' "), quoting *First Natl. Bank of Mankato v. Wilson*, 234 Minn. 160, 164, 47 N.W.2d 764 (1951); *McCuiston v. Addressograph-Multigraph Corp.*, 308 N.C. 665, 669, 303 S.E.2d 795 (1983), fn. 3 ("the phrase 'shall be deemed incapable of producing occupational loss of hearing' creates a conclusive presumption"); *Gulf Oil Corp. v. Heath*, 255 Ark. 604, 609, 501 S.W.2d 787 (1973) (interpreting the word "deemed" as creating conclusive presumption); *State ex rel. Morrison v. Thomas*, 80 Ariz. 327, 333, 297 P.2d 624 (1956) (same).

**{¶ 23}** In *State ex rel. Walker v. Clark*, 144 Ohio St. 305, 311, 58 N.E.2d 773 (1944), we noted that "[a] conclusive presumption may be defined as an inference which the law makes so peremptory that it may not be overcome by any contrary proof, however strong." Proof of the basic fact is, in effect, conclusive evidence establishing the presumed fact. A presumption, whether mandatory or permissive, is therefore an *evidentiary device*—"a staple of our adversary system of factfinding." *Cty. Court of Ulster Cty., New York v. Allen*, 442 U.S. 140, 156, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

**{¶ 24}** The Supreme Court of Utah has recently explained that a legislature's "decision to make a presumption conclusive 'rests upon grounds of expediency or policy so compelling in character as to override the generally fundamental requirement of our system of law that questions of fact must be resolved according to the proof.' " *Davis v. Provo City Corp.*, 2008 UT 59, 193 P.3d 86, ¶ 22, quoting *United States v. Provident Trust Co.,* 291 U.S. 272, 281-282, 54 S.Ct. 389, 78 L.Ed. 793 (1934). Accordingly, in civil litigation, a presumption may implement a legislative policy to make a cause of action easier (or harder) to bring by providing a means to resolve cases in which the dispositive evidence is difficult or impossible to find. 2 McCormick, *Evidence*, Section 343, at 681-682 (7th Ed.Broun 2013); Mueller & Kirkpatrick, *Evidence*, Section 3.5, at 138 (1995).

**{¶ 25}** In enacting the 1989 law, the General Assembly created a conclusive presumption by establishing that a mineral rights holder had abandoned a severed mineral interest if the 20 year statutory period passed without a saving event. The statute remedied the difficulties faced by a surface owner seeking to quiet title to a dormant mineral interest, an action that requires proof that the mineral rights holder—who may not be locatable or identifiable from land records—had abandoned and relinquished that interest. At common law, such an action would have failed absent proof of the property owner's subjective intent. *See Beer*, 61 Ohio St.2d at 121, 399 N.E.2d 1227. Thus, by providing a conclusive presumption that the mineral interest had been abandoned in favor of the surface owner if the holder failed to take timely action to preserve it, the legislature provided an effective method of terminating abandoned mineral rights through a quiet title action.

**{¶ 26}** But because the conclusive presumption of abandonment was only an evidentiary device that applied to litigation seeking to quiet title to a dormant mineral interest, the Dormant Mineral Act does not automatically transfer the interest from the mineral rights holder to the surface owner by operation of law.

{¶ 27} In enacting the 1989 law, the General Assembly sought to help clear title to dormant mineral interests and to encourage the development of Ohio's mineral resources by allowing parties to rely on a record chain of title to them. *See* R.C. 5301.55. It becomes apparent from analyzing the sequential legislation on this topic that the legislature did not intend title to dormant mineral interests to pass automatically and outside the record chain of title.

{¶ 28} In accord with this analysis, we conclude that the 1989 law was not self-executing and did not automatically transfer ownership of dormant mineral rights by operation of law. Rather, a surface holder seeking to merge those rights with the surface estate under the 1989 law was required to commence a quiet title action seeking a decree that the dormant mineral interest was deemed abandoned.

*The 2006 Amendment to the Dormant Mineral Act*

{¶ 29} The 2006 amendment to R.C. 5301.56(B) provides that a dormant mineral interest "shall be deemed abandoned and vested in the owner of the surface of the lands subject to the interest if the requirements established in division (E) of this section are satisfied." 2006 Sub.H.B.No. 288 ("H.B. 288").

{¶ 30} R.C. 5301.56(E) directs the surface holder to give advance notice to the mineral rights holder, allowing it an opportunity to preserve its mineral rights from being deemed abandoned and merged with the surface estate. R.C. 5301.56(E), (F), and (G). If neither a claim to preserve the interest nor an affidavit proving that a saving event occurred within the preceding 20 years is timely recorded, then the surface holder may record a notice that the mineral interest has been abandoned, and "the mineral interest shall vest in the owner of the surface of the lands formerly subject to the interest, and the record of the mineral interest shall cease to be notice to the public of the existence of the mineral interest or of any rights under it." R.C. 5301.56(H). This statute therefore operates to establish the surface owner's marketable record title in the mineral estate.

**{¶ 31}** Dormant mineral interests did not automatically pass by operation of law to the surface owner pursuant to the 1989 law. Thus, as of June 30, 2006, any surface holder seeking to claim dormant mineral rights and merge them with the surface estate is required to follow the statutory notice and recording procedures enacted in 2006 by H.B. 288. These procedures govern the manner by which mineral rights are deemed abandoned and vested in the surface holder and apply equally to claims that the mineral interests were abandoned prior to June 30, 2006.

**{¶ 32}** Applying R.C. 5301.56 as amended by H.B. 288 to claims filed after its effective date does not impair vested rights in violation of the Retroactivity Clause contained in Article II, Section 28, of the Ohio Constitution. Determining whether a law violates the Retroactivity Clause involves a two-step test:

[W]e must first "determine whether the General Assembly expressly intended the statute to apply retroactively." [*Bielat v. Bielat,* 87 Ohio St.3d 350] at 353, 721 N.E.2d 28 [2000]. If so, we must determine whether "the statute is substantive, rendering it *unconstitutionally* retroactive, as opposed to merely remedial." (Emphasis sic.) Id. A substantive statute is one that "impairs vested rights, affects an accrued substantive right, or imposes new or additional burdens, duties, obligations, or liabilities as to a past transaction." Id. at 354, 721 N.E.2d 28; *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 106-107, 522 N.E.2d 489.

*Longbottom v. Mercy Hosp. Clermont*, 137 Ohio St.3d 103, 2013-Ohio-4068, 998 N.E.2d 419, ¶ 22. A statute that applies retroactively and that is substantive violates Article II, Section 28, of the Ohio Constitution. *Id.*

13

**{¶ 33}** Here, H.B. 228 is not expressly retrospective, and it applies prospectively to all claims that mineral rights have been abandoned that are asserted after its effective date.

**{¶ 34}** We recognized in *Longbottom* that the Retroactivity Clause bars statutes that act prospectively to extinguish preexisting legal rights, but "it does not prohibit legislation that 'merely affect[s] "the methods and procedure by which *rights are recognized, protected and enforced, [and] not * * * the rights themselves.*" (Emphasis added.)' " *Id*. at ¶ 25, quoting *Bielat* at 354, quoting *Weil v. Taxicabs of Cincinnati, Inc.,* 139 Ohio St. 198, 205, 39 N.E.2d 148 (1942). *Longbottom* involved a statutory amendment that modified the method of calculating prejudgment interest, changing the rate of interest and the date from which it accrued and precluding recovery of prejudgment interest on future damages. We concluded that the legislation did not violate the Retroactivity Clause: "Because the amended statute does not eliminate the right to prejudgment interest but only modifies the remedy available, it applies to causes of action accruing before but filed on or after June 2, 2004, the effective date of the statute." *Id*. at ¶ 26.

**{¶ 35}** Similarly, here, the General Assembly has not divested the surface holder of a right to abandoned mineral interests that accrued prior to the effective date of H.B. 288, but rather, it modified only the method and procedure by which the right is recognized and protected. As this court has recognized, evidentiary rules (such as the conclusive presumption established by the 1989 law) are procedural in nature and therefore changing them does not alter a vested substantive right. *See Ackison v. Anchor Packing Co.*, 120 Ohio St.3d 228, 2008-Ohio-5243, 897 N.E.2d 1118, ¶ 29. And notably, the legislature has merely provided a method for the surface holder to obtain marketable record title to an abandoned mineral interest without having to resort to litigation to have that interest declared abandoned. Accordingly, applying the notice and recording procedures enacted by

14

H.B. 288 to surface owners whose claims to abandoned mineral interests are asserted after June 30, 2006, does not violate the Retroactivity Clause.

*Delay Rental Payments*

**{¶ 36}** Payment of delay rental is neither a title transaction nor a saving event for purposes of the Dormant Mineral Act.

**{¶ 37}** Delay rental "represent[s] sums paid by the lessee to the lessor on an annual, quarterly or other basis for the privilege of postponing drilling or other operations under [an oil and gas] lease." *Davis v. Hardman*, 148 W.Va. 82, 89, 133 S.E.2d 77 (1963). It is "the consideration paid by the lessee to the lessor in return for permission to delay drilling or production." *Antelope Prod. Co. v. Shriners Hosp. for Crippled Children*, 236 Neb. 804, 806, 464 N.W.2d 159 (1991).

**{¶ 38}** The payment of delay rental is not a saving event either under the 1989 Dormant Mineral Act or the 2006 amendment to it, because it is not "a title transaction that has been filed or recorded in the office of the county recorder of the county in which the lands are located" as required by the statute. A record of a delay rental payment is not included in the sets of records, such as deeds, mortgages, and leases, that the county recorder is required to keep pursuant to R.C. 317.08. Had the General Assembly intended the payment of delay rental to be a title transaction, it could have required records of delay rental payments to be filed with the county recorder. It did not do so. Additionally, a "title transaction" is a transaction that affects title to any interest in land. R.C. 5301.47(F). There is no basis to support a conclusion that a delay rental payment alone affects title separate and apart from the oil and gas lease.

**{¶ 39}** Because a delay rental payment does not affect title to any interest in land, occurs outside the record chain of title, and is not filed or recorded in the office of the county recorder, it is neither a title transaction nor a saving event.

**Conclusion**

{¶ 40} The 1989 Dormant Mineral Act was not self-executing and did not automatically transfer ownership of dormant mineral rights by operation of law; rather, the surface holder was required to bring a quiet title action seeking a decree that the mineral rights had been abandoned in order to merge those rights into the surface estate.

{¶ 41} The 2006 amendment to the Dormant Mineral Act applies to claims asserted after its effective date and specifies the procedure that a surface holder is required to follow in order to have dormant mineral rights deemed abandoned and merged with the surface estate.

{¶ 42} The payment of delay rental is not a saving event. The Dormant Mineral Act requires that a title transaction affect title to any interest in land and be recorded to constitute a saving event. But the Revised Code makes no provision for recording the payment of delay rental with the county recorder, and in this case, it was not recorded. Therefore, the payment of delay rental is not a saving event.

So answered.

O'CONNOR, C.J., and FRENCH, J., concur.

LANZINGER, J., concurs in judgment only.

KENNEDY, J., concurs in judgment only as to the first certified question and concurs as to the second certified question, with an opinion.

PFEIFER, J., dissents as to the first certified question and concurs as to the second certified question, with an opinion joined by O'NEILL, J.

_____

**KENNEDY, J., concurring in judgment only in the answer to the first certified question and concurring in the answer to the second certified question.**

{¶ 43} I fully agree with the majority's analysis and resolution of the second certified question that a delay-rental payment is not a title transaction. I also agree

16

with the majority's conclusion that the 1989 Dormant Mineral Act ("DMA"), former R.C. 5301.56, Am.Sub.S.B. No. 223, 142 Ohio Laws, Part I, 981, 985-987 ("S.B. 223"), was not self-executing and that a severed mineral interest cannot revert to the surface owner absent judicial action. Therefore, I agree with the majority that the answer to the first certified question is that the 2006 version of the DMA applies to all claims asserted after June 30, 2006. I write separately, however, because in my view, the 1989 DMA was ambiguous regarding what it required for a severed mineral interest to be "abandoned."

{¶ 44} The General Assembly enacted the Marketable Title Act ("MTA") to "extinguish" interests and claims in land that existed prior to the root title. See R.C. 5301.47(A) and 5301.50. However, as demonstrated by our decision in *Heifner v. Bradford*, 4 Ohio St.3d 49, 446 N.E.2d 440 (1983), the MTA was unsuccessful in extinguishing all dormant severed mineral interests. After our decision in *Heifner*, the General Assembly enacted the DMA.

{¶ 45} In drafting the 1989 version of the DMA, the legislature used the term "abandoned." As explained below, when the legislature was considering the bill, the term "abandoned" had a particular meaning under Ohio common law—to have property declared abandoned required evidence of both nonuse and an intent of the owner to abandon the property. However, the 1989 DMA also provided that severed mineral estates were "abandoned" if certain statutory elements were satisfied, such as the passage of time without the occurrence of a saving event. Because of this inconsistency, I find that the 1989 version of the DMA was ambiguous.

{¶ 46} For the reasons that follow, I would interpret the phrase "deemed abandoned and vested" as requiring evidence that none of the statutory elements of the 1989 DMA, former R.C. 5301.56(B)(1)(a) through (c), were satisfied and that the holder of the severed mineral interest intended to abandon them.

*I. Statutory Construction*

**{¶ 47}** "The ultimate inquiry in the interpretation of statutes is to ascertain the legislative intent." *Caldwell v. State*, 115 Ohio St. 458, 466, 154 N.E. 792 (1926). One of the cardinal rules of statutory construction is that we must first examine the language of the statute itself. *Provident Bank v. Wood*, 36 Ohio St.2d 101, 105, 304 N.E.2d 378 (1973). " '[I]f the words [are] free from ambiguity and doubt, and express plainly, clearly, and distinctly the sense of the lawmaking body, there is no occasion to resort to other means of interpretation.' " *Risner v. Ohio Dept. of Natural Resources, Ohio Div. of Wildlife*, 144 Ohio St.3d 276, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 12, quoting *Slingluff v. Weaver*, 66 Ohio St. 621, 64 N.E. 574 (1902), paragraph two of the syllabus.

**{¶ 48}** "Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." R.C. 1.42. We presume that the legislature "knows the existing condition of the law, whether common law * * * or statute law." *Wachendorf v. Shaver*, 149 Ohio St. 231, 248, 78 N.E.2d 370 (1948), citing *State ex rel. Morris v. Sullivan*, 81 Ohio St. 79, 90 N.E. 146 (1909); *Norris v. State*, 25 Ohio St. 217 (1874); *Johnson v. Johnson*, 31 Ohio St. 131 (1876); and S. *Sur. Co. v. Std. Slag Co.*, 117 Ohio St. 512, 159 N.E. 559 (1927). " '[W]here a statute uses a word which has a definite meaning at common law, it will be presumed to be used in that sense and not in the loose popular sense.' " *Thompson v. Community Mental Health Ctrs. of Warren Cty., Inc.*, 71 Ohio St.3d 194, 195, 642 N.E.2d 1102 (1994), quoting *Richardson v. Doe*, 176 Ohio St. 370, 372-373, 199 N.E.2d 878 (1964).

**{¶ 49}** " '[T]he General Assembly is not presumed to do a vain or useless thing, and * * * when language is inserted in a statute it is inserted to accomplish some definite purpose.' " *State v. Wilson*, 77 Ohio St.3d 334, 336, 673 N.E.2d 1347 (1997), quoting *State ex rel. Cleveland Elec. Illum. Co. v. Euclid*, 169 Ohio St. 476, 479, 159 N.E.2d 756 (1959). When reviewing a statute, " 'we should not pick out

one sentence and disassociate it from the context.' " *MacDonald v. Bernard*, 1 Ohio St.3d 85, 89, 438 N.E.2d 410 (1982), quoting *Black-Clawson Co. v. Evatt*, 139 Ohio St. 100, 104, 38 N.E.2d 403 (1941). We must look at the four corners of the enactment to determine the intent of the legislature. *Id*. If a statute is ambiguous, then the court may consider "other matters" in determining the intention of the legislature. R.C. 1.49.

## II. *1989 Version of the DMA*

{¶ 50} The 1989 version of the DMA stated: "Any mineral interest held by any person, other than the owner of the surface of the lands subject to the interest, shall be deemed abandoned and vested in the owner of the surface," unless (a) the mineral interest is related to coal, (b) the interest is held by the United States, the state of Ohio, or another political body described in the statute, or (c) one of the listed saving events has occurred within the preceding 20 years. Former R.C. 5301.56(B)(1), 142 Ohio Laws, Part I, at 985-987.

## III. *The Term "Abandoned" in the 1989 DMA*

### A. The Term "Abandoned" Has a Particular Meaning in Property Law

{¶ 51} "In Ohio, abandoned property 'is property over which the owner has relinquished all right, title, claim and possession with the intention of not reclaiming it or resuming its ownership, possession or enjoyment.' " *In re Panel Town of Dayton, Inc*., 338 B.R. 764, 774 (S.D.Ohio 2006), quoting *Doughman v. Long*, 42 Ohio App.3d 17, 21, 536 N.E.2d 394 (12th Dist.1987). Abandonment is "the intentional relinquishment of a known right." *Hodges v. Ettinger*, 127 Ohio St. 460, 463, 189 N.E. 113 (1934). Proof of abandonment requires both " 'evidence of an *intention* to abandon as well as of acts by which the *intention* is put into effect.' " (Emphasis sic.) *Wyatt v. Ohio Dept. of Transp*., 87 Ohio App.3d 1, 5, 621 N.E.2d 822 (11th Dist.1993), quoting, *W. Park Shopping Ctr. v. Masheter*, 6 Ohio St.2d 142, 144, 216 N.E.2d 761 (1966).

**{¶ 52}** While "lapse of time or other circumstances [may be] indicative of an intention [to] abandon," *Junction RR. Co. v. Ruggles*, 7 Ohio St. 1, 10-11 (1857), "[n]on-use of the property, in and by itself, does not constitute abandonment," *Mead Corp. v. Huntington Natl. Bank*, 4th Dist. Jackson No. 472, 1983 WL 3170, *2 (Apr. 25, 1983); *see also Farnsworth v. Burkhart*, 2014-Ohio-4184, 21 N.E.3d 577, ¶ 73 (7th Dist.). " 'To constitute abandonment, nonuse of property must be coupled with intention to relinquish or abandon it.' " *Wapakoneta Bd. of Edn. v. Unknown Heirs of Aughinbaugh*, 71 Ohio Law Abs. 1, 14, 128 N.E.2d 534 (C.P.1954), citing 1 Ohio Jurisprudence 2d, Abandonment, Section 9, at 8-9 (1953).

B.  The Term "Abandoned" and the MTA

**{¶ 53}** The lead opinion provides a succinct history of the MTA.  From its enactment in 1961 until it was amended to incorporate the DMA, the MTA did not use the term "abandoned."  Instead, the MTA used the term "extinguish" for the purpose of making property marketable.  R.C. 5301.47(A) (this provision has not changed since it was enacted).  The term "abandoned" first appears in the statutory scheme in 1989, when the MTA was amended to enact the DMA.

**{¶ 54}** The 1989 DMA provided, among other things, that a mineral interest "shall be deemed abandoned and vested in the owner of the surface" if a saving event has not occurred within the preceding 20 years.  Former R.C. 5301.56(B)(1)(c)(i) through (vi), 142 Ohio Laws, Part I, at 986-987.  Each of the saving events describes a use of the minerals or an action with regard to the interest in the minerals.  *Id*.

**{¶ 55}** The concurring and dissenting opinion concludes that it is readily clear from reading the words of the 1989 DMA that the statute was self-executing.  However, R.C. 1.42 requires that we construe words that have attained "particular meaning" accordingly.

**{¶ 56}** Since the General Assembly did not define the word "abandoned" in its 1989 enactment of the DMA, it must be presumed "to [have] know[n] the

20

meaning of words, to have used the words of a statute advisedly and to have expressed legislative intent by the use of the words found in the statute." *Wachendorf*, 149 Ohio St. at 237, 78 N.E.2d 370.

{¶ 57} Because the term "abandoned" had a particular meaning in Ohio property common law at the time the DMA was enacted, we must presume that the General Assembly "used [it] in that sense," *Thompson*, 71 Ohio St.3d at 195, 642 N.E.2d 1102; *see also In re Panel Town of Dayton*, 338 B.R. at 774, " 'to accomplish some definite purpose,' " *Wilson*, 77 Ohio St.3d at 336, 673 N.E.2d 1347, quoting *State ex rel. Cleveland Elec. Illum. Co*., 169 Ohio St. at 479, 159 N.E.2d 756.

C.  Former R.C. 5301.56(B)(1) of the 1989 DMA Is Ambiguous

{¶ 58} As explained above, the term "abandoned" had a particular meaning in Ohio property common law when the DMA was enacted.  It required both an action and an intention to abandon.  However, the 1989 DMA required only nonuse for a mineral interest to be "deemed abandoned and vested in the owner of the surface."  Because the 1989 DMA is internally inconsistent, it is ambiguous.  And when a statute is ambiguous, a court may consider, "among other matters," the circumstances of the enactment, available legislative history, if any, and the consequences of a particular construction to determine the General Assembly's intent.  R.C. 1.49(B), (C), and (E).

*IV.  Intention of the General Assembly*

A.  R.C. 1.49(B): Circumstances of Enactment

{¶ 59} In a case of first impression, this court decided competing claims of ownership to oil and gas rights under the MTA in *Heifner*, 4 Ohio St.3d 49, 446 N.E.2d 440.  In *Heifner*, the appellants claimed a fractional ownership interest in the oil and gas rights in a tract of land in Muskingum County.  Their interest was traceable to a 1916 deed that reserved the oil and gas rights to the grantor, Elvira Sprague.  Sprague died in 1931, and her reserved rights were bequeathed to her two

daughters. An authenticated copy of the will was filed in Muskingum County in 1957, and in accordance with the terms of the will, an affidavit of transfer was filed evidencing the transfer of the oil and gas rights to Sprague's two daughters. But by that time, the two daughters had died intestate, and their respective interests had been divided among their children, and affidavits of transfer evidencing these conveyances were also filed in 1957. The appellees were the surface owners of the same tract, whose root of title was a 1936 conveyance that failed to mention that the oil and gas rights had been reserved.

**{¶ 60}** We set forth the issue as follows: "whether appellees, who have an unbroken chain of title of record of forty years or more, have a marketable record title even though appellants' competing interest arose from an independent chain of title recorded during the forty-year period subsequent to appellees' root of title." *Id*. at 50. In concluding that the appellants' interest was *not* extinguished by operation of the MTA, we held that the MTA, based on the Model Act, confers a marketable record title on one who has an unbroken chain of title for 40 years or more, subject to any interest arising out of a "title transaction" recorded after the root of title that started the chain. This court concluded that the affidavits of transfer in 1957 were "title transactions" that broke the chain of title of the appellees, even though those transactions arose from an independent chain of title. Therefore, the interest conveyed to the appellants in 1957 was not extinguished by operation of the MTA.

**{¶ 61}** Our interpretation of the MTA in *Heifner* was "[t]he impetus for the creation of the DMA." *Wendt v. Dickerson*, 5th Dist. Tuscarawas No. 2014 AP 01 0003, 2014-Ohio-4615, ¶ 21; *see also* Stewart, *When the Shale Gale Hit Ohio: The Failures of the Dormant Mineral Act, Its Heroic Interpretations, and Grave Choices Facing the Supreme Court*, 43 Cap.U.L.Rev. 435, 440 (2015), fn. 46 (*Heifner* led to the 1989 version of the DMA because "it became obvious that the

[MTA] would not be an effective mechanism for clarifying or terminating title to ancient mineral claims").

### B.  R.C. 1.49(C):  Legislative History

{¶ 62} To discern the legislature's intent in cases of ambiguous statutory language, we have considered legislative proceedings and debates.  *State ex. rel. Shafer v. Ohio Turnpike Comm.*, 159 Ohio St. 581, 588, 113 N.E.2d 14 (1953), citing *Caldwell*, 115 Ohio St. at 467, 154 N.E. 792; *Toledo v. Pub. Util. Comm.*, 135 Ohio St. 57, 19 N.E.2d 162 (1939).  The guiding principle for use of these materials is that they should be "helpful and objective" in assisting us in determining the intention of the legislature.  *Meeks v. Papadopulos*, 62 Ohio St.2d 187, 191, 404 N.E.2d 159 (1980).

{¶ 63} Testifying in support of the 1989 DMA was William J. Taylor, a lawyer whose firm represented the appellants before this court in *Heifner*, 4 Ohio St.3d 49, 446 N.E.2d 440.  He explained the history of the MTA and said that the court's holding in *Heifner* demonstrated the ineffectiveness of the MTA in "eliminating" dormant severed mineral estates.  Testimony in Support of S.B. 223, House Select Committee on Civil Justice, June 28, 1988.

{¶ 64} In his view, "[t]he proposed bill * * * contain[ed] the essential elements recommended by the National Conference of Commissioners on Uniform State Laws ['NCCUSL'] at its conference in Boston in August, 1986."  *Id.* at 3. When he addressed the committee, Taylor provided its members with a copy of the Uniform Dormant Mineral Interests Act ("UDMIA"), which was drafted by the NCCUSL and included a prefatory note and comments.

{¶ 65} The UDMIA, with the prefatory note and comments, is available at http://www.uniformlaws.org/shared/docs/dormant%20mineral%20interests/udmia _final_86.pdf (accessed July 12, 2016).  The prefatory note to the UDMIA provided an overview of the various ways in which mineral interests are subject to a possessory interest and then outlined the legal difficulties in resolving dormant

mineral interests. It then delineated a series of approaches to combat those problems.

{¶ 66} The prefatory note to the UDMIA stated:

> The common law concept of abandonment of mineral interests provides useful relief in some situations. As a general rule, severed mineral interests that are regarded as separate possessory estates are not subject to abandonment. But less than fee interests in the nature of a lease or profit may be subject to abandonment. In some jurisdictions the scope of the abandonment remedy has been broadened to extend to oil and gas rights on the basis that these minerals, being fugacious, are owned in the form of incorporeal hereditament, and hence are subject to abandonment.
>
> The abandonment remedy is limited both in scope and by practical proof problems. *Abandonment requires a difficult showing of intent to abandon; nonuse of the mineral interest alone is not sufficient evidence of intent to abandon*.

(Emphasis added.) *Id* at 2.

{¶ 67} Thereafter, the prefatory note stated that some jurisdictions had passed laws permitting nonuse of a mineral interest for a specified term to terminate mineral rights. It went on to explain: "The nonuse scheme has advantages and disadvantages. Its major attraction is that it enables extinguishment of dormant interests solely on the basis of nonuse; proof of intent to abandon is unnecessary." *Id*.

{¶ 68} The controlling phrase in the 1989 DMA at issue here was "[a]ny mineral interest * * * shall be deemed abandoned and vested in the owner of the surface * * *." Former R.C. 5301.56(B)(1), 142 Ohio Laws, Part I, at 986. The

NCCUSL recognized the limitation of using the term "abandonment" in a statutory scheme because of its particular meaning at common law. While the concurring and dissenting opinion comes to a different conclusion, it nevertheless agrees that the General Assembly had the UDMIA "available as a model" in drafting the DMA. Concurring and dissenting opinion at ¶ 114. Therefore, the legislature knew that the NCCUSL stated in its prefatory note to the UDMIA that resolving dormant mineral interests through abandonment required evidence of the holder's intent to abandon.

### C. R.C. 1.49(E): Consequences of a Particular Construction

{¶ 69} When two or more statutes are ambiguous and relate to the same subject matter, we also construe them in pari materia "to discover and carry out legislative intent." *Sheet Metal Workers' Internatl. Assn., Local Union No. 33 v. Gene's Refrigeration, Heating & Air Conditioning, Inc.*, 122 Ohio St.3d 248, 2009-Ohio-2747, 910 N.E.2d 444, ¶ 38, citing *State ex rel. Ellis Super Valu, Inc. v. Indus. Comm.*, 115 Ohio St.3d 224, 2007-Ohio-4920, 874 N.E.2d 780, ¶ 13. This is true even if the related statutes were passed at different times. *State ex. rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph two of the syllabus.

{¶ 70} As the lead opinion points out, the General Assembly enacted the DMA within the statutory scheme of the MTA. One of the purposes of the MTA is to facilitate and simplify land-title transactions by permitting a person to rely on the record chain of title. R.C. 5301.55. Because the DMA was enacted within the MTA, it is clear that one of the purposes of the DMA was to ensure that the transfer of dormant mineral rights to surface owners would occur within the record chain of title.

{¶ 71} The concurring and dissenting opinion concludes that the mere passage of time without a saving event was sufficient to complete the transfer. However, this conclusion is at odds with the purpose of the MTA.

{¶ 72} "Self-executing means * * * 'effective immediately without the need of any type of implementing action.' " *State ex rel. Vickers v. Summit Cty. Council*, 97 Ohio St.3d 204, 2002-Ohio-5583, 777 N.E.2d 830, ¶ 31, quoting *Black's Law Dictionary* 1364 (7th Ed.1999). If the 1989 DMA were self-executing, then the purpose of ensuring a record chain of title in discerning ownership of severed mineral interests would be subverted. *See* R.C. 5301.55. As the concurring and dissenting opinion properly concludes, the DMA "is absolutely silent as to any action required by the surface owner to effectuate the vesting of the mineral rights." Concurring and dissenting opinion at ¶ 113. Therefore, if the statute were self-executing, it would create a transfer of ownership without any record in the chain of title, which is exactly what the MTA seeks to prevent.

{¶ 73} The conclusion that the 1989 DMA was self-executing would also impair the purpose of the DMA, which is "to clear title and promote the use of the mineral rights for development and production." *Chesapeake Exploration, L.L.C. v. Buell*, 144 Ohio St.3d 490, 2015-Ohio-4551, 45 N.E.3d 185, ¶ 25. Because the statute would operate to transfer mineral rights outside of the record chain of title, no mineral developer or speculator could readily rely on the record chain of title to purchase a severed mineral interest or enter into a production contract or lease. For example, a severed-mineral-interest holder who is either unaware or who does not care that the mineral interest has reverted to the surface owner could lease the mineral rights to a lessee who would be unaware that the lessor has no mineral rights to lease because the reversion occurred outside the chain of title.

{¶ 74} In the end, the ramification of a self-executing provision would be to render the marketability of the mineral interest questionable. Any development of a mineral interest without the true owner's consent subjects the trespasser to liability for damages. *Brady v. Stafford*, 115 Ohio St. 67, 79, 152 N.E. 188 (1926). Therefore, there is "an extreme reluctance to drill" without permission from all

mineral-interest owners. Roberton, *Abandonment of Mineral Rights*, 21 Stan.L.Rev. 1227, 1233 (1969).

### D. "Extinguished" and "Abandoned" Are Not Synonymous

**{¶ 75}** The General Assembly used the term "extinguish" to clear "interests and claims, existing prior to the effective date of the root of title." R.C. 5301.47(A). Therefore, as used in the MTA, an "extinguishment" of a property interest occurs by operation of law.

**{¶ 76}** "Extinguish" means "[t]o bring an end to; to put an end to." *Black's Law Dictionary* 703 (10th Ed.2014). This court has used the term "extinguish" when referring to an interest in real property that is lost by automatic operation.

**{¶ 77}** In *Lane v. Kennedy*, we recognized that an owner of land who fails to prosecute an adverse possessor within the time permitted by law "raises a presumption of an extinguishment or a surrender of his claim." 13 Ohio St. 42, 47 (1861); *see also Grace v. Koch*, 81 Ohio St.3d 577, 581, 692 N.E.2d 1009 (1998). In cases involving mortgage deeds, we have also recognized that " 'the equity of redemption is extinguished by release or foreclosure.' " *Lloyd v. Quimby*, 5 Ohio St. 262, 264 (1855), quoting *Lockwood v. Sturdevant*, 6 Conn. 373, 390 (1827).

**{¶ 78}** Appellate courts have also used the term "extinguish" in this way. *See RBS Citizens, N.A. v. Krasnov*, 8th Dist. Cuyahoga No. 100992, 2014-Ohio-4217, ¶ 19 (wife's property rights in a foreclosed home were extinguished when the home was sold at a sheriff's sale); *Dir. of Highways v. Kramer*, 23 Ohio App.2d 219, 227, 262 N.E.2d 561 (11th Dist.1970) (Cook, J., dissenting) ("appropriation in fee simple of a parcel of property extinguishes all rights, visible and invisible, which the owner has in the parcel"); *McCarthy v. Lippitt*, 150 Ohio App.3d 367, 2002-Ohio-6435, 781 N.E.2d 1023, ¶ 33 (7th Dist.) (a partition order "extinguishes a tenant's rights in the whole property, and establishes the tenant's exclusive right of ownership in the part of the property set off to him").

**{¶ 79}** In *Lone Star Steakhouse & Saloon of Ohio, Inc. v. Ryska*, the Eleventh District Court of Appeals distinguished between the extinguishment of an easement and the abandonment of an easement. 11th Dist. Lake No. 2003-L-192, 2005-Ohio-3398. "[T]he extinguishment of an easement by the doctrines of estoppel or laches invokes a general inquiry into whether retaining the easement would be fair and equitable given the acts and/or omissions of the parties of interest." *Id*. at ¶ 46. Conversely,

> [m]ere non-use of an easement, for a period however long, will not amount to abandonment. In addition to the non-use, there must be acts or circumstances clearly manifesting an intention to abandon the easement. Intent to abandon an easement must be evidenced by decisive, unequivocal acts inconsistent with continued use and enjoyment of the easement. An intention to abandon is a material question, and it may be proved by an innumerable variety of acts. It is a question of fact to be ascertained from the circumstances of the case, and, in effect, no one case can be authority for another. The determination of whether an easement has been abandoned is a question of fact.

(Citations omitted.) *Id*. at ¶ 56.

**{¶ 80}** Therefore, unlike the term "abandon," which requires an intent to relinquish property, the term "extinguish" operates regardless of intention.

**{¶ 81}** As stated above, the General Assembly used the term "extinguish" in the MTA, but chose to use the word "abandoned" in the DMA. Therefore, we must conclude that the legislature understood that the words had different meanings.

*V. The 1989 DMA Was Not Self-Executing*

A.  Determination of Intent to Abandon Is Required

**{¶ 82}** Analyzing the DMA in light of the circumstances of its enactment, its legislative history, and the consequences of a particular construction, I conclude that the General Assembly's decision to use the term "abandoned" establishes that it was not the legislature's intent that the DMA would be self-executing.

**{¶ 83}** In *Heifner*, the court highlighted the ineffectiveness of the MTA in terminating dormant mineral rights.  4 Ohio St.3d 49, 446 N.E.2d 440.  The conveyance of minerals by will, which is a "title transaction" under the MTA, created an independent chain of title outside of the record chain.  R.C. 5301.47(F).  This frustrated the very purpose of the MTA—to facilitate and simplify title transactions by allowing persons to rely on a record chain of title.  See R.C. 5301.55.

**{¶ 84}** As mentioned above, prior to amending the MTA and enacting the 1989 version of the DMA, the General Assembly heard testimony from a lawyer whose firm had represented the appellants in *Heifner*.  After pointing out the ineffectiveness of the MTA in extinguishing dormant severed mineral interests, the lawyer provided the General Assembly with a copy of the NCCUSL's UDMIA, which included a prefatory note and comments.

**{¶ 85}** The prefatory note to the UDMIA stated that use of the common-law concept of abandonment was "useful," but it was "limited both in scope and by practical proof problems" because it "required a difficult showing of intent."  On the other hand, using the "nonuse" scheme to extinguish dormant mineral interests required only proof of nonuse; proof of intent was not necessary.  UDMIA prefatory note at 2.

**{¶ 86}** When it was drafting the DMA, the General Assembly was aware of its use of the term "extinguish" in the MTA.  *See* R.C. 5301.47(A) (" 'Marketable record title' means a title of record, as indicated in section 5301.48 of the Revised

Code, which operates to extinguish such interests and claims, existing prior to the effective date of the root of title, as are stated in section 5301.50 of the Revised Code"). Nevertheless, the General Assembly chose a different term— "abandoned"—for use in the DMA. As explained above, these terms are not synonymous; they cannot be used interchangeably. Therefore, the General Assembly used the term "abandoned" for some definite purpose.

{¶ 87} As previously stated, the term "abandoned" had particular meaning in Ohio property common law, requiring an action and intent to relinquish. Therefore, by using "abandon" instead of "extinguish," the legislature interjected the requirement of ascertaining the intent of the mineral-interest holder. The determination whether an owner of property abandoned the property is usually a question of fact and depends primarily on the intention of the owner. *Kiser v. Logan Cty. Bd. of Commrs.*, 85 Ohio St. 129, 131, 97 N.E. 52 (1911). All the facts and circumstances must be considered. *Id.* Accordingly, a judicial action is required to make the determination.

{¶ 88} As previously mentioned, the concurring and dissenting opinion recognizes that the UDMIA was "available as a model" in drafting the DMA. Concurring and dissenting opinion at ¶ 114. However, the concurring and dissenting opinion ignores the prefatory note to the UDMIA. The General Assembly chose the word "abandoned," which interjected the common-law meaning of abandonment into the DMA. That meant a surface owner seeking to reacquire a severed mineral estate must not only satisfy the statutory elements of the DMA, but must also provide evidence that the holder intended to abandon the severed mineral estate. There is no opportunity for those determinations to be made if the DMA is self-executing.

B.  A Judicial Determination Is Needed to Establish Intent to Abandon, and

Requiring a Judicial Determination of Abandonment

Promotes the Purpose of the MTA

{¶ 89} By requiring a judicial action to determine whether there was an abandonment of a severed mineral interest under the 1989 DMA, the General Assembly ensured that the problem encountered in *Heifner*—a severed mineral interest transferred outside the record chain of title—would not occur.  Under the 1989 DMA, the trier of fact first had to determine whether any of the numerous saving events occurred.  Upon finding that none had occurred, the trier of fact would then have to determine, based on all the surrounding facts and circumstances, whether the owner had intended to abandon the mineral interest.

{¶ 90} In addressing the weakness of the MTA as highlighted by our decision in *Heifner*, the General Assembly did not narrow the definition of "title transaction."  See R.C. 5301.47(F) (defining "title transaction").  That term has remained unchanged in the MTA and is still used to define one of the saving events in the DMA.  R.C. 5301.56(B)(3)(a); former R.C. 5301.56(B)(1)(c)(i), 142 Ohio Laws, Part I, at 986.

{¶ 91} As defined in R.C. 5301.47(F), a decree of a court that affects the title to an interest in land is a "title transaction."  In accord with R.C. 5309.53, once the decree is filed with the recorder of the county in which the land is situated, it enters into the record chain of title.

{¶ 92} Judicial intervention, therefore, serves to facilitate both the paramount purpose of the MTA and the DMA because a recorded judgment indicating that a severed mineral interest has reverted to the surface owner provides notice within the record chain of title, which in turn promotes the use of mineral estates.

C.  Use of the Term "Deemed" Does Not Indicate that
the General Assembly Intended the 1989 DMA to Be Self-Executing

{¶ 93} The concurring and dissenting opinion asserts that the lead opinion should have employed the "common usage" of the word "deem," and then it cites several cases from this court that it claims have interpreted "deemed" to mean that the deemed result "occurred automatically by operation of law."  Concurring and dissenting opinion at ¶ 120.

{¶ 94} In each of the statutes at issue in the cases cited in the concurring and dissenting opinion there is an event, or events, that must occur before a particular result is "deemed" to have occurred.  *See State ex rel. Battin v. Bush*, 40 Ohio St.3d 236, 533 N.E.2d 301 (1988) (unless due to an illness or injury, if a county officer fails to perform his or her duties for 90 consecutive days, the office shall be deemed vacant); *State ex rel. Trago v. Evans*, 166 Ohio St. 269, 141 N.E.2d 665 (1957) (same); *State ex rel. Foster v. Madison Twp. Bd. of Edn.*, 151 Ohio St. 413, 86 N.E.2d 598 (1949) (if a teacher is not notified of the school board's intent to not rehire by a particular date, then the teacher is deemed to be reemployed); *Jacot v. Secrest*, 153 Ohio St. 553, 93 N.E.2d 1 (1950) (same).

{¶ 95} However, in all of these cases, the qualifying event that triggered the "deemed" result was typically simple to establish and its occurrence was uncontested and the relevant statute did not require a determination of intent.  In both *Battin* and *Trago*, there was no dispute that the officer in each case failed to perform his duties for 90 consecutive days, thereby triggering the deemed-vacant provision.  Similarly, in *Foster* and *Jacot,* it was undisputed that the teacher in each case did not timely receive a notice not to rehire, and therefore both were "deemed" to be rehired.

{¶ 96} In the instant case, former R.C. 5301.56(B)(1) provided that a severed mineral interest "shall be deemed abandoned and vested in the owner of the surface, if none of the following applies * * *."  142 Ohio Laws, Part I, at 986.

Even if the concurring and dissenting opinion is correct that "deemed abandoned" meant that mineral interests were automatically deemed abandoned by operation of law, that language did not operate until a determination that none of the events enumerated in former R.C. 5301.56(B)(1)(c) had occurred. Moreover, because the DMA must be read in light of the particular meaning that the term "abandoned" had at the time the statute was enacted, a court, after concluding that the statutory elements indicated that the severed mineral interest was "deemed abandoned and vested in the surface owner," was required to make an additional determination as to whether the mineral-interest holder intended to abandon the mineral interest. Therefore, I find that the cases cited in the concurring and dissenting opinion are distinguishable from the instant case and are not persuasive in determining whether it was the intention of the General Assembly to make the 1989 DMA self-executing.

### D. Reliance on the Effect of Indiana's Dormant-Mineral-Interest Statute Is Misplaced

{¶ 97} Contrary to the assertions in the concurring and dissenting opinion, Indiana's dormant-mineral-interest statute that was reviewed by the United States Supreme Court in *Texaco, Inc. v. Short*, 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982), is different from the DMA in two important ways. The first distinction is the language of the Indiana statute.

{¶ 98} Former Ind.Code 32-5-11-1, which was in a chapter entitled "Lapse of Mineral Interest," provided:

> Any interest in coal, oil and gas, and other minerals, shall, if unused for a period of 20 years, be *extinguished*, unless a statement of claim is filed in accordance with section five hereof, and the ownership shall revert to the then owner of the interest out of which it was carved.

(Emphasis added.) In 2002, former Ind.Code 32-11-5-1 was amended slightly and recodified as Ind.Code 32-23-10-2. Pub.L. 2-2002.

{¶ 99} In drafting this statute, the Indiana legislature chose to use the word "extinguished." Its use of that word is important. As highlighted by the prefatory note to the UDMIA discussed above, "[t]he nonuse scheme has advantages and disadvantages. Its major attraction is that it enables the *extinguishment* of dormant interests solely on the basis of nonuse; proof of intent to abandon is unnecessary." (Emphasis added.) *Id.* at 2. By comparison, the Ohio General Assembly chose to use the word "abandoned," understanding that its meaning under common law required an action and an intent to relinquish.

{¶ 100} The second distinction between the two statutes is the types of events that could serve as a saving event. The Indiana statute provided that a timely filed statement of claim would serve to "deem" that the mineral interest was being used. Former Ind.Code 32-5-11-4 (amended and recodified as Ind.Code 32-23-10-4, Pub.L. 2-2002). A recorder presented with a statement of claim was then required to record the statement of claim "in a book to be kept for that purpose." Former Ind.Code 32-5-11-7 (recodified as Ind.Code 32-23-10-7, Pub.L. 2-2002).

{¶ 101} In comparison, the 1989 DMA used the language "if none of the following applies." Former R.C. 5301.56(B)(1), 142 Ohio Laws, Part I, at 986. The statute then lists three sets of circumstances that preclude a severed mineral interest from being deemed abandoned and vested in the surface owner: (1) the severed mineral interest is in coal, (2) the severed mineral interest is owned by the government, or (3) one or more of six enumerated saving events occurred within the 20-year period as defined by the DMA. Former R.C. 5301.56(B)(1)(a), (b), and (c), 142 Ohio Laws, Part I, at 986.

{¶ 102} One of the listed saving events is that the mineral interest has been the "subject of a title transaction." Former R.C. 5301.56(B)(1)(c)(i), 142 Ohio Laws, Part I, at 986. In *Buell*, this court held that pursuant to the plain language of

R.C. 5301.47(F), the term "title transaction" means " 'any transaction affecting title to any interest in land,' which means that it is not limited to the transactions enumerated in the statute or to transactions that transfer an ownership interest." 144 Ohio St.3d 490, 2015-Ohio-4551, 45 N.E.3d 185, ¶ 39, quoting R.C. 5301.47(F). Therefore, there are numerous possibilities of what could constitute a "title transaction," and only a court can make the determination whether a transaction is a title transaction.

{¶ 103} The "if none of the following applies" language is a conditional barrier to deeming a severed mineral interest abandoned and vested in the surface owner. That language does not interfere with the operation of the statute, it merely requires a determination that none of the conditions have occurred during the 20-year period defined by the statute.

*VI. Conclusion*

{¶ 104} I fully agree with the majority's analysis and resolution of the second certified question—a delay-rental payment is not a title transaction or a saving event. I also agree with the majority's conclusion that the 1989 DMA, former R.C. 5301.56, was not self-executing and that a severed mineral interest could not revert to the surface owner absent judicial action. Therefore, I agree with the majority that the answer to the first certified question is that the 2006 version of the DMA applies to all claims asserted after June 30, 2006. However, in my view, the 1989 DMA was ambiguous regarding what was required for a severed mineral interest to be "abandoned."

{¶ 105} After considering "other matters" pursuant to R.C. 1.49 to determine the intent of the General Assembly in enacting the 1989 DMA, I would interpret the phrase "deemed abandoned and vested in the owner of the surface" as requiring evidence that none of the statutory elements of the 1989 DMA, former R.C. 5301.56(B)(1)(a) through (c), apply and that the holder of the severed mineral interest intended to abandon them.

{¶ 106} Respectfully, I concur in judgment only in the lead opinion's answer to the first certified question and concur in its answer to the second certified question.

_____

**PFEIFER, J., dissenting from the answer to the first certified question and concurring in the answer to the second certified question.**

{¶ 107} The federal court certified two questions to this court. I dissent from the majority's response to the first question. I would hold that the 1989 version of R.C. 5301.56 applies to quiet-title actions filed after 2006 in which the surface owner alleges that mineral rights automatically vested in the surface owner as a result of abandonment prior to the effective date of the 2006 amendments to R.C. 5301.56. I concur in the majority's response to the second question that a payment of delay rental is neither a title transaction nor a saving event under the Ohio Dormant Mineral Act ("ODMA").

1989 ODMA

{¶ 108} In 2006, hindsight may have provided the General Assembly the vision it wished it had had when it passed the first version of the ODMA in 1988. But regardless of the changes the General Assembly implemented in 2006, former R.C. 5301.56 ("1989 ODMA") functioned as the law in this state for 17 years, and through its operation created vested rights in certain property owners. Those vested rights cannot be taken away without running afoul of the Ohio Constitution and the Ohio Revised Code.

{¶ 109} As the lead opinion relates, the General Assembly enacted the 1989 ODMA "to provide a method for the termination of dormant mineral interests and the vesting of their title in surface owners, in the absence of certain occurrences within the preceding 20 years." Sub.S.B. No. 223, 142 Ohio Laws, Part I, 981 ("S.B. 223"). It implemented that clear and unambiguous purpose through a statute that was bluntly efficient. The 1989 ODMA stated that "[a]ny mineral interest held

by any person, other than the owner of the surface of the lands subject to the interest, shall be deemed abandoned and vested in the owner of the surface, if none of the following applies." Former R.C. 5301.56(B)(1), S.B. 223, 142 Ohio Laws, Part I, 986. The statute set forth the few conditions that could prevent the reunification of mineral and surface rights in the land: if the mineral interest was coal or was owned by a government entity (former R.C. 5301.56(B)(1)(a) and (b)) or if one of the saving events under former R.C. 5301.56(B)(1)(c) had occurred within the past 20 years. *Id.* Those saving events required some indication of use by the mineral-rights holder and ranged from filing a claim to preserve the interest to actual drilling or mining. *Id.* at 986-987.

{¶ 110} The impact of the law was not immediate—the General Assembly included in the 1989 ODMA a three-year grace period during which a mineral-rights holder could preserve his interest by performing one of the saving events listed in former R.C. 5301.56(B)(1)(c). Former R.C. 5301.56(B)(2), S.B. 223, 142 Ohio Laws, Part I, 987. A process was thus in place for a mineral-rights holder to prevent the statutory reunification of the mineral rights with the surface rights. Mineral-rights holders who had done nothing with their rights in the previous 20 years still had an additional three years to preserve their interests.

Statutory Interpretation

{¶ 111} In interpreting a statute, we must first look at its plain language. "If the meaning of the statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary." *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545, 660 N.E.2d 463 (1996). Thus, a statute that is clear should be unsusceptible to a court's filling in perceived blanks. "[A] statute that is free from ambiguity and doubt is not subject to judicial modification under the guise of interpretation." *Bernardini v. Conneaut Area City School Dist. Bd. of Edn.*, 58 Ohio St.2d 1, 4, 387 N.E.2d 1222 (1979). "In construing a statute, it is the duty of the court to give effect to the words used and

not to insert words not used." *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 220, 631 N.E.2d 150 (1994).

{¶ 112} The plain language of the 1989 ODMA states that absent a saving event, a separate mineral interest shall be deemed abandoned and the mineral interest shall vest in the owner of the surface property. The statute uses the word "shall"—the mineral interest "shall be deemed abandoned and vested in the owner of the surface"—and this court has "repeatedly recognized that use of the term 'shall' in a statute or rule connotes a mandatory obligation unless other language evidences a clear and unequivocal intent to the contrary." *State ex rel. Cincinnati Enquirer v. Lyons*, 140 Ohio St.3d 7, 2014-Ohio-2354, 14 N.E.3d 989, ¶ 28.

{¶ 113} The former statute plainly set forth the few conditions that the mineral-rights holder needed to meet to prevent the reunification of mineral and surface rights in the land. Former R.C. 5301.56 is absolutely silent as to any action required by the surface owner to effectuate the vesting of the mineral rights. There is no provision requiring the surface owner to affirmatively assert any claim, record any claim, or file any form of suit or other declaration of the vested interests. There is no statutory language that suggests that the vesting of the mineral rights was anything other than automatic. The statute mandated that it "shall" occur.

{¶ 114} The General Assembly could have required some further affirmative action by the surface owner prior to vesting, but it did not. The Uniform Dormant Mineral Interests Act ("UDMIA"), which the National Conference of Commissioners on Uniform State Laws approved and recommended in August 1986 and which was thus available as a model at the time Ohio's ODMA was enacted, requires the surface owner to "maintain an action to terminate a dormant mineral interest" that is "in the nature of and requires the same notice as is required in an action to quiet title." UDMIA, Section 4(a), available at http://www.uniformlaws.org/shared/docs/dormant%20mineral%20interests/udmia

_final_86.pdf (accessed Dec. 16, 2015). Ohio did not incorporate that provision into the 1989 ODMA.

{¶ 115} The fact that it did not had no constitutional consequence. The General Assembly stood on solid constitutional ground in not requiring notice or filing of suit by the surface owner prior to the mineral interest being deemed abandoned and vested in the surface owner. Before Ohio adopted the 1989 ODMA, the United States Supreme Court upheld the constitutionality of Indiana's Dormant Mineral Interests Act, "a statute providing that a severed mineral interest that is not used for a period of 20 years automatically lapses and reverts to the current surface owner of the property, unless the mineral owner files a statement of claim in the local county recorder's office." *Texaco, Inc. v. Short*, 454 U.S. 516, 518, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982). The Indiana statute "contained a 2-year grace period in which owners of mineral interests that were then unused and subject to lapse could preserve those interests by filing a claim in the recorder's office." *Id.* at 518-519. Like Ohio's 1989 ODMA, the Indiana statute did not require the surface owner to provide any notice to the mineral-rights holder before the lapse and reversion occurred; the court referred to the statute as "self-executing":

> Appellants simply claim that the absence of specific notice prior to the lapse of a mineral right renders ineffective the self-executing feature of the Indiana statute. That claim has no greater force than a claim that a self-executing statute of limitations is unconstitutional.

*Id.* at 536.

{¶ 116} The court held that the inaction of the mineral-rights holder rather than any act of the surface owner had caused the property right to lapse:

[T]he State of Indiana has enacted a rule of law uniformly affecting all citizens that establishes the circumstances in which a property interest will lapse through the inaction of its owner. None of the cases cited by appellants suggests that an individual must be given advance notice before such a rule of law may operate.

*Id.* at 537.

{¶ 117} Like Indiana, Ohio enacted a self-executing statute that vested in a surface owner any separated mineral rights that had been dormant for a period of 20 years. Like Indiana's, Ohio's statute was constitutional, and respondents do not argue that it was unconstitutional. They are left instead to argue that the General Assembly did not mean what the statute clearly said.

The Lead Opinion's Interpretation of the 1989 ODMA

{¶ 118} The lead opinion subjects the 1989 ODMA to judicial modification under the guise of interpretation. What does the lead opinion interpret the General Assembly to have meant? Where the General Assembly wrote that dormant mineral interests "shall be deemed abandoned and vested in the owner of the surface," the lead opinion interprets something like, "To reunite mineral rights with the surface rights, the surface owner must successfully prosecute a quiet-title action against the owner of the mineral interest based upon the mineral-rights holder's alleged abandonment of the mineral rights, and in that quiet-title action, the surface owner shall enjoy a conclusive presumption that the mineral rights have been abandoned." That is, under the lead opinion's interpretation, if the mineral rights are deemed abandoned under the 1989 ODMA, the surface owner enjoys only a "conclusive presumption" (a term not used in the statute) in a potential quiet-title action (an action that is not required by or even referred to in the statute). The lead opinion accomplishes this interpretation almost entirely through inserting words

not used by the General Assembly. And the lead opinion virtually ignores the word "vested."

### The Meaning of "Deemed Abandoned"

**{¶ 119}** The lead opinion's interpretation finds its genesis in the words "deemed abandoned." The lead opinion states that deeming something abandoned creates a conclusive presumption of abandonment that can be used in a future action for proof of abandonment. But instead, the lead opinion should have employed the common usage of the word "deem." There is no hidden meaning involving future proceedings embedded in the word "deemed." " ' "Deemed" has been defined as "considered," "determined," or "adjudged" * * *.' " *Jacot v. Secrest*, 153 Ohio St. 553, 559, 93 N.E.2d 1 (1950), quoting *State ex rel. Hoagland v. Prairie Cty. School Dist. No. 13*, 116 Mont. 294, 298, 151 P.2d 168 (1944). At the time the 1989 ODMA was passed, *Black's Law Dictionary* defined "deem" as "[t]o hold; consider; adjudge; believe; condemn; determine; treat as if; construe." *Black's Law Dictionary* 374 (5th Ed.1979). In *State ex rel. Brecksville Edn. Assn. v. State Emp. Relations Bd.*, 74 Ohio St.3d 665, 666, 660 N.E.2d 1199 (1996), fn. 1, this court noted that bargaining units that had been "deemed certified" by an uncodified section of an act "are treated as if they had been certified normally." In *Texaco*, the United States Supreme Court indicated that private property that is "deemed to be abandoned" is "treat[ed] * * * as abandoned." *Texaco*, 454 U.S. at 530, 102 S.Ct. 781, 70 L.Ed.2d 738.

**{¶ 120}** This court has previously addressed statutes containing the word "deemed" and interpreted them to mean that the deemed result occurred automatically by operation of law. In *State ex rel. Battin v. Bush*, 40 Ohio St.3d 236, 239, 533 N.E.2d 301 (1988), the statute at issue, R.C. 305.03(A), provided, "Whenever any county officer fails to perform the duties of his office for ninety consecutive days, * * * his office shall be deemed vacant." *Id*. at 239. This court held that "[t]he inquiry established by this statute is not whether one has the right

41

to a particular office but whether, upon certain facts, he has abandoned the office. * * * [T]he statute deems the office to be vacant automatically, upon the occurrence of the statutorily determined events." *Id.* This court stated that the statute was "by its terms, self-executing. Upon the happening of the enumerated events, the office is then vacant." *Id.* at 241.

{¶ 121} In *State ex rel. Trago v. Evans*, 166 Ohio St. 269, 273, 141 N.E.2d 665 (1957), this court addressed a prior version of R.C. 305.03, which read:

> Whenever any county officer is absent from the county for ninety consecutive days, except in case of sickness or injury as provided in this section, his office shall be deemed vacant and the board of county commissioners shall declare a vacancy to exist in such office.

*See id.* at 271.

{¶ 122} Because the sheriff at issue in *Trago* had been jailed in another county for more than 90 days, this court held that the county commissioners had properly declared the office vacant and refilled it. That the office was "deemed vacant" under the statute in fact created a vacancy. In *Trago*, "[t]he vacancy had been created by operation of law, leaving a mere ministerial duty to appoint someone to fill the office." *State ex rel. Battin*, 40 Ohio St.3d at 239, 533 N.E.2d 301.

{¶ 123} In *State ex rel. Foster v. Madison Twp. Bd. of Edn.*, 151 Ohio St. 413, 86 N.E.2d 598 (1949), the court addressed a statute that "deemed re-employed" any teacher who had not been given notice by the school board by a certain date of its intent to not rehire the teacher:

> Any teacher employed under a limited contract shall at the expiration of such limited contract be deemed re-employed under the provisions of this act at the same salary plus any increment provided by the salary schedule unless the employing board shall give such teacher written notice on or before the thirty-first day of March of its intention not to re-employ him.

*See id.* at 414.

{¶ 124} This court affirmed the appellate court's granting of a writ of mandamus ordering the district to execute a contract with a teacher who had not received the required notice of intent not to rehire. The deemed reemployment made the offering of an employment contract mandatory under the law once the condition of failing to give timely notice of a decision not to rehire had been met.

{¶ 125} In *Jacot*, 153 Ohio St. at 557, 93 N.E.2d 1, this court considered the same "deemed re-employed" statute and acknowledged that through its ordinary operation, the statute automatically requires the offer of reemployment once the date passes for giving notice of intent not to rehire.

{¶ 126} In *In re VHA Diagnostic Servs., Inc.*, 65 Ohio St.3d 210, 602 N.E.2d 647, (1992), this court adopted the reasoning of a court of appeals' decision that treated the terms "considered" and "deemed" as synonymous. In *VHA*, this court addressed former R.C. 3702.53(A)(3), which set forth that a certificate of need "shall be considered to have been granted" if the director of the Ohio Department of Health ("ODH") did not grant or deny the certificate within the applicable time period set forth in the statute. This court decided the case "on the authority of the court of appeals' opinion below" and attached that opinion as an appendix to the opinion of this court. *Id.* The court of appeals opinion referred to the "shall be considered to have been granted" statutory language as the "deemed-granted provision," under which the "ODH by inaction permits a [certificate of

need] to be issued by operation of law." *Id.* at 217. That the certificate of need was "considered to have been granted" meant that it had been deemed granted by operation of law.

{¶ 127} Thus, under the plain meaning of the word "deemed" and under the interpretation of the word by this court, the "deemed abandoned" language in the 1989 ODMA means that the mineral rights were, by operation of law, to be considered or treated as abandoned.

{¶ 128} But the lead opinion claims that the "deemed abandoned" language created a presumption of abandonment that "was only an evidentiary device that applied to litigation seeking to quiet title to a dormant mineral interest." Lead opinion at ¶ 26. The Michigan Supreme Court, in addressing the "deemed abandoned" language in Michigan's dormant-mineral-interest act rejected the idea that it created any evidentiary presumption:

> Contrary to defendants' arguments, the act does not create any evidentiary presumption. None of the provisions of the act purport to be concerned with the owner's intent to abandon * * *. Rather, the act is designed to increase the marketability and development of severed mineral interests by creating a rule of substantive law which requires owners to undertake minimal acts indicative of ownership at least every 20 years. The statutory approach to these issues has the added advantage of eliminating uncertainty and minimizing litigation, see *In re Mercure Estate*, 391 Mich. 443, 448, 216 N.W.2d 914 (1974).

(Footnote deleted.) *Van Slooten v. Larsen*, 410 Mich. 21, 50-51, 299 N.W.2d 704 (1980).

{¶ 129} Like the Michigan statute, the 1989 ODMA did not create a presumption to be employed in a future action—instead, it created a rule of substantive law. The law vested a property right by operation of law upon the nonoccurrence of a saving event within a certain period. The 1989 ODMA did not merely create a simplified way to prove abandonment in a quiet-title action; instead, *on its own*, it vested in the surface owner the interest in the minerals under the surface.

{¶ 130} Still, a surface owner may choose to bring an action to quiet title pursuant to R.C. 5303.01 in order to *enforce* the rights vested through the operation of the 1989 ODMA. But the lead opinion conflates the substantive property right vested by the operation of the 1989 ODMA with a quiet-title action brought pursuant to R.C. 5303.01 to achieve judicial recognition of that property right. The 1989 ODMA vested the right, and a separate quiet-title action would allow the surface owner to confirm that the statutory elements had been met and that the reversion of the mineral rights had occurred. Vesting is not delayed until the surface owner brings a quiet-title action; the quiet-title action simply shows the world that the interest had vested.

{¶ 131} *Van Slooten* recognized that vesting under a dormant-mineral-interest act with "deemed abandoned" language occurs without a hearing. The court held that "due process does not require a hearing prior to vesting title in the owner of the surface estate" and that a person who had been deemed to have abandoned his mineral interest would have an opportunity after vesting "for a hearing to determine whether the statutory requirements have been met and to ascertain the ownership of the property." *Van Slooten*, 410 Mich. at 55, 299 N.W.2d 704. The vesting does not follow a quiet-title action; the quiet-title action follows the vesting.

{¶ 132} Finally, let us accept for a moment that the 1989 ODMA did create a conclusive presumption of abandonment that could be employed in a quiet-title

action. What happened to that conclusive presumption? Why could a surface owner not make use of that conclusive presumption in a quiet-title action against the mineral-rights holder today?

Vesting

{¶ 133} The lead opinion spends a great deal of time discussing the words "deemed abandoned" and precious little time addressing the word "vested." The 1989 ODMA stated that the mineral rights "shall be deemed abandoned and vested in the owner of the surface." That word, "vested," is a problem for the lead opinion. The General Assembly's use of the word "vested" in the 1989 ODMA belies the lead opinion's assertion that the reunification of the mineral rights with the surface rights is somehow incomplete, short of litigation, upon the passage of 20 years of inactivity by the mineral-rights holder. Far from being incomplete, a vested right is "complete, consummated and subject to involuntary divestiture only upon due process of law." *Viers v. Dunlap*, 1 Ohio St.3d 173, 176, 438 N.E.2d 881 (1982), *overruled in part on other grounds, Wilfong v. Batdorf,* 6 Ohio St.3d 100, 451 N.E.2d 1185 (1983), paragraph three of the syllabus. This court has recognized that "as defined, a right is 'vested' when it 'so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent.' " *Harden v. Ohio Atty. Gen.*, 101 Ohio St.3d 137, 2004-Ohio-382, 802 N.E.2d 1112, ¶ 9, quoting *Black's Law Dictionary* 1324 (7th Ed.1999). That the mineral interest is "vested in the owner of the surface" means that there is no further procedure necessary to complete the reunification of the mineral rights with the surface rights.

{¶ 134} That vesting is crucial. "A 'vested right' can 'be created by common law or statute and is generally understood to be the power to lawfully do certain actions or possess certain things; in essence, it is a property right.' " *State ex rel. Jordan v. Indus. Comm.,* 120 Ohio St.3d 412, 2008-Ohio-6137, 900 N .E.2d 150, ¶ 9, quoting *Washington Cty. Taxpayers Assn. v. Peppel*, 78 Ohio App.3d 146, 155, 604 N.E.2d 181 (4th Dist.1992).

{¶ 135} It is because those property rights vested in the qualifying surface owners pursuant to the 1989 ODMA that the 2006 amendment to the statute cannot apply to those surface owners. First, the 2006 changes, which are still in effect today, create a process—where none had existed before—requiring surface owners to perform certain tasks *prior* to mineral interests being reunited with the surface interest and vested in the surface owner:

> Any mineral interest held by any person, other than the owner of the surface of the lands subject to the interest, shall be deemed abandoned and vested in the owner of the surface of the lands subject to the interest if the requirements established in division (E) of this section are satisfied and none of the following applies.

R.C. 5301.56(B).

{¶ 136} The requirements of R.C. 5301.56(E)—providing notice to the mineral-rights holder and filing an affidavit of abandonment with the county recorder—must be met *before* the mineral rights can be deemed abandoned and vested in the surface owner. The 2006 amendment applies—by its own terms— only to situations in which vesting in the surface owner has not yet occurred and places conditions on surface owners before the mineral rights can vest in them. Nothing in the 2006 amendment suggests that it applies in situations in which mineral rights had already vested before the effective date of the amendment. It simply sets forth how mineral interests that had not vested in the surface owner before the effective date of the amendment can become vested in the surface owner.

{¶ 137} Any other interpretation is contrary to the protections from retroactive legislation provided by R.C. 1.58 and Article II, Section 28 of the Ohio Constitution. R.C. 1.58(A)(2) states that the amendment of a statute does not

"[a]ffect any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or incurred thereunder." Property rights automatically vested in the surface owner under the 1989 ODMA when the statutory conditions were met; thus, any amendment to the statute that operates to affect those rights— by requiring, for instance, that mineral rights cannot be vested in the surface owner without the performance of certain notice procedures—contravenes R.C. 1.58.

{¶ 138} Further, Article II, Section 28 of the Ohio Constitution prohibits the General Assembly from passing retroactive laws. There is no indication that the General Assembly intended the 2006 amendment to be retroactive, but statutory amendments that appear prospective in operation nonetheless violate the prohibition against retroactive laws if the statute's prospective operation would retroactively destroy rights that had already vested:

> We have also stated that the "retroactivity clause nullifies those new laws that 'reach back and create new burdens, new duties, new obligations, or new liabilities not existing at the time [the statute becomes effective].' *Miller v. Hixson* (1901), 64 Ohio St. 39, 51, 59 N.E. 749, 752." *Bielat* [*v. Bielat*], 87 Ohio St.3d [350,] 352-353, 721 N.E.2d 28 [2000]. In *Van Fossen* [*v. Babcock & Wilcox Co.,* 36 Ohio St.3d 100, 522 N.E.2d 489 (1988)]*,* this court stated that the constitutional limitation against retroactive laws " 'include[s] a prohibition against laws which commenced on the date of enactment and which operated in futuro, but which, in doing so, divested rights, particularly property rights, which had been vested anterior to the time of enactment of the laws.' " [*Id.* at 105], quoting Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence (1936), 20 Minn.L.Rev. 775, 781-782.

*Tobacco Use Prevention & Control Found. Bd. of Trustees v. Boyce*, 127 Ohio St.3d 511, 2010-Ohio-6207, 941 N.E.2d 745, ¶ 14. To apply the requirements of the 2006 amendment to surface owners who had obtained vested mineral rights pursuant to the 1989 ODMA implements a textbook example of an unconstitutionally retroactive law. Under the majority's holding, the new law reaches back and divests the surface owners of property rights that vested prior to the operation of the 2006 amendment to the statute. As applied by the majority, the 2006 amendment impairs substantive vested rights and thus is unconstitutional.

{¶ 139} The lead opinion glosses over the significant differences between the 1989 ODMA and the ODMA as amended in 2006. As amended in 2006, the ODMA does much more than impose notice and procedural requirements on a surface owner. Pursuant to R.C. 5301.56(H)(1)(a), a mineral-rights holder can file a present-day claim preserving his interest in mineral rights long after his interest would have been deemed abandoned under the 1989 ODMA. A mineral-rights holder can leave his or her interest dormant in virtual perpetuity under the 2006 amendment—the clock begins to run only after a surface owner serves notice of an intent to declare the mineral interest abandoned. At that point, the mineral-rights holder has 60 days to file a claim to preserve the mineral interest and can preserve the claim by simply stating that "the holder does not intend to abandon, but instead to preserve, the holder's rights in the mineral interest." R.C. 5301.56(C)(1) and (H)(1). The mineral-rights holder does not have to provide any evidence that a saving event had occurred within the past 20 years; simply filing the claim that says, essentially, "I'd like to hold on to that mineral interest" after receiving notice from the surface owner of an intent to declare the interest abandoned is enough to squelch the reunification of the mineral rights with the surface rights. *Dodd v. Croskey*, 143 Ohio St.3d 293, 2015-Ohio-2362, 37 N.E.3d 147, ¶ 30.

{¶ 140} Applying the 2006 amendment to surface owners whose rights to mineral interests had vested pursuant to the 1989 ODMA constitutes nothing less

than a taking. The 1989 ODMA provided that a mineral-rights holder's interest was considered abandoned by operation of law, having lapsed due to the mineral-right holder's 20 years of inaction, and was subject to a three-year grace period during which a mineral-rights owner could preserve the interest through a simple filing. In contrast, under the majority's interpretation of the 2006 amendment, a surface owner whose mineral-rights interest vested by operation of the 1989 ODMA lost those mineral rights immediately on the effective date of the 2006 amendment—without any required period of inactivity by the surface owner and with no opportunity to preserve the property right through satisfying a statutory condition—for no reason other than that the General Assembly wished the rights to revert to someone else. The General Assembly gave no indication that the 2006 amendment should be interpreted that way, and R.C. 1.58 and the Ohio Constitution should prevent it from being interpreted that way.

Conclusion

{¶ 141} Because of the skyrocketing value of mineral rights in certain parts of our state, some property owners are going to reap profits they never would have imagined when they purchased or inherited their surface or mineral rights. The General Assembly could not have foreseen the financial impact the 1989 ODMA would have on certain parties. One observer notes:

> These shale formations prior to the advent of Hydraulic Fracturing were deemed worthless by the upstream industry; ergo, the mineral interest in oil and gas were also worthless, so allowing the mineral interest to lay dormant was the natural result. It was of little difference to anyone whether the subsurface rights vested with the surface owner [or] not. There was no foreseeable justification for filing a claim to preserve one's claim to mineral interest in such shale plays. The "shale gale" changed all that * * *.

50

Fenner L. Stewart, *When the Shale Gale Hit Ohio: The Failures of the Dormant Mineral Act, Its Heroic Interpretations, and Grave Choices Facing the Supreme Court*, 43 Cap.U.L.Rev. 435, 466 (2015), fn. 295.

{¶ 142} But the shale gale cannot change what the General Assembly passed in 1988, nor should it change the way we interpret it. The 1989 ODMA vested rights in certain property owners that could not be taken away by subsequent legislation. I accordingly dissent.

O'NEILL, J., concurs in the foregoing opinion.

————————————

Volkema Thomas Miller & Scott, L.P.A., Michael S. Miller, and Daniel R. Volkema; and Critchfield & Johnston and Steven J. Shrock, for petitioner.

Jones Day, Jeffery D. Ubersax, and Dean C. Williams; and Thornburg & Bean and Charles H. Bean, for respondent North American Coal Royalty Company.

Reed Smith, L.L.P., Nicolle R. Snyder Bagnell, and Kevin C. Abbott, for respondents Chesapeake Exploration, L.L.C., CHK Utica, L.L.C., Dale Pennsylvania Royalty, L.P., Larchmont Resources, L.L.C., and TOTAL E&P USA, Inc.

Kegler Brown Hill & Ritter Co., L.P.A., Andrew J. Sonderman, John P. Brody, and Margeaux Kimbrough, in support of petitioner, for amici curiae Gulfport Energy Corporation, Protégé Energy III, L.L.C., and Paloma Resources, L.L.C.

Michael DeWine, Attorney General, Eric E. Murphy, State Solicitor, and Samuel C. Peterson, Deputy Solicitor, in support of petitioner, for amicus curiae the state of Ohio.

Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A., Gregory W. Watts, Matthew W. Onest, David E. Butz, and William G. Williams, in support of petitioner, for amici curiae Jeffco Resources, Inc., Christopher and Veronica

Wendt, Carol S. Miller, Mark and Kathy Rastetter, Douglas Henderson, John Yaskanich, Djuro and Vesna Kovacic, Brett and Kim Trissel, and Steven E. and Diane Cheshier.

Bricker & Eckler, L.L.P., Matthew W. Warnock, Daniel C. Gibson, and Daniel E. Gerken, in support of respondents regarding the first certified question, for amici curiae the Noon, Shepherd, Greegor, Merecka, and Kinney Families.

_____